NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0087n.06
Filed: February 4, 2005

No. 03-4385

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| JOSE V. HILBERT, JR., | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant,* | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| OHIO DEPARTMENT OF REHABILITATION | ) | **O P I N I O N** |
| AND CORRECTIONS, et al., | ) | |
| | ) | |
| *Defendants-Appellees.* | ) | |
| | ) | |

**BEFORE:**     **GUY and COLE, Circuit Judges, and TARNOW, District Judge**[*]

**R. GUY COLE, JR., Circuit Judge.**     Plaintiff-Appellant Jose V. Hilbert, a former

corrections officer at Grafton Correctional Institution in Ohio, appeals the district court's grant of

summary judgment to Defendants-Appellees Ohio Department of Rehabilitation and Correction

("ODRC"), Warden Carl Anderson, and Labor Relations Officer Rebecca Everly, on Hilbert's

various civil rights claims.  Hilbert, who had committed numerous disciplinary offenses over the

course of his career as a corrections officer, claims that ODRC punished him more severely than it

punished non-minority corrections officers who had committed similar offenses. He also claims that

ODRC violated his due process rights by not properly affording him a pretermination hearing.

_____

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of
Michigan, sitting by designation.

The district court found, on Hilbert's Title VII and § 1983 claims, that he had not made the required *prima facie* case for discrimination, and that even if he had, he had not met his burden with regard to pretext. As for Hilbert's due process claim, the district court found that no violation of Hilbert's due process rights had occurred since he had not shown up for a scheduled hearing on the disciplinary charges against him.

For the following reasons, we **AFFIRM** the judgment of the district court.

**I.**

Plaintiff-Appellant Jose Hilbert was a corrections officer ("CO") at Grafton Correctional Institution. As a CO, he was represented by the Ohio Civil Service Employees Association ("OCSEA"), and the terms and conditions of his employment were governed by a collective bargaining agreement between the union and the State. The two relevant parts of the agreement are as follows:

> **24.02 - Progressive Discipline**
> The Employer will follow the principles of progressive discipline. Disciplinary action shall be commensurate with the offense.
>
> **24.06 - Prior Disciplinary Actions**
> All records relating to oral and/or written reprimands will cease to have any force and effect and will be removed from an employee's personnel file twelve (12) months after the date of the oral and/or written reprimand if there has been no other discipline imposed during the past twelve (12) months.
>
> Records of other disciplinary action will be removed from an employee's file under the same conditions as oral/written reprimands after twenty-four months if there has been no other discipline imposed during the past twenty-four (24) months.

Because this appeal deals directly with the disciplinary process utilized by the ODRC, a brief overview of the process is warranted.

A supervisor who has found a CO in violation of a disciplinary rule can give a CO "corrective counseling," an oral discussion that is not considered "discipline," or he can give an "oral reprimand," which is considered discipline. In either situation, a form is placed in the CO's disciplinary file, kept by the Labor Relations Officer ("LRO"). In the case of an oral reprimand, the warden then must review the form to determine if the reprimand was warranted. In more extreme cases, the supervisor may "request further action," in which case the file is forwarded to the LRO and the warden for further investigation and resolution. Regardless, in all cases requiring any action greater than "corrective counseling," discipline is supposed to be meted out according to the philosophy of "Progressive Discipline," using a grid which gives an expected punishment range for the various types of infractions and offender histories. However, the ODRC disciplinary rules provide for significant leeway in applying the grid, allowing consideration of "distinguishing facts" and "work record or other unique circumstances surrounding the offense," while emphasizing a general policy of consistency in discipline.

If any disciplinary action would include a loss of pay (*e.g.* fine or suspension), the collective bargaining agreement provides for a "pre-disciplinary meeting" of the type required by *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). In such cases, the LRO prepares a notice of violation which can later be amended by either the LRO or the warden. This notice is then given to a hearing officer appointed by the warden. After reviewing the file, the hearing officer decides if testimony should be taken on the issue of whether there was just cause for the discipline. After

the hearing, the hearing officer makes a recommendation to the warden as to what disciplinary action should be taken. The report of the hearing officer, along with the employee's file and a list of any prior disciplinary actions, is given to the warden by the LRO. The warden usually, but not always, follows the hearing officer's recommendations. In cases involving a loss of pay, the action must also be approved by the ODRC's Office of Collective Bargaining in Columbus, but it is undisputed that such approval has almost never been withheld. However, in sending the "packet" of material in any given case to the Columbus office, the LRO would prepare a "just cause worksheet" listing all prior disciplinary actions against the relevant employee(s). Though the warden's name was signed on these worksheets, it is undisputed that the Grafton LRO, Rebecca Everly, often signed the warden's name to the Grafton "just cause worksheets" she would prepare following the warden's disciplinary decisions. She would then send them out without the warden reviewing them.

Hilbert was hired as a CO on January 3, 1994. At training, he received written "corrective counseling" based on a "heated verbal altercation" with another trainee. On February 14, 1995, Hilbert was tried in Cuyahoga County on aggravated arson charges based on an incident in which he had set fire to a cross in his own front yard and then reported that he was the victim of a cross-burning. He requested, and was granted, personal leave to attend the trial from February 14th-16th, but on the 15th, he pleaded guilty. After a verbal altercation with an officer in the court at sentencing, Hilbert was sentenced to ten days in jail. He called his superiors, requesting ten additional days of leave, claiming that he needed the additional time off because his trial was

extended. When prison officials found out that Hilbert was actually in jail, he was suspended for

five days without pay on May 31, 1995. Hilbert did not challenge this suspension.

Several other disciplinary events occurred in Hilbert's career prior to the events directly at

issue in the instant case:

> - On November 21, 1995, Hilbert was given corrective counseling for using abusive language towards an inmate.
>
> - On August 14, 1997, Hilbert received an oral reprimand from an officer at the prison for interrupting a roll call and making crude remarks about the CO with whom he was assigned.
>
> - Later in August 1997, Hilbert filed a race-based discrimination claim with the Ohio Civil Rights Commission and the EEOC, on the basis of his oral reprimand, which he claimed had been issued by a "racist" officer. It is unclear what happened to this claim.
>
> - On October 6, 1997, Hilbert was given a one-day suspension for letting a mentally-ill inmate out of his cell. However, he denied that he had let the inmate out, and filed a grievance. The action was eventually settled, with restitution of pay, and expungement of his record, though the LRO never received word that she was to remove the suspension from his record.
>
> - On December 23, 1997, Hilbert was given a one-day suspension by Warden Anderson for mocking the comments a training officer was giving to a group of new COs. Hilbert denied the allegations of the training officer (who had filed the report leading to the suspension), and an agreement was later reached to return Hilbert's day of pay, but to leave the suspension on his record for one year, instead of the usual two.

As a result of the expungement of the two one-day suspensions, both parties agree that as of March

16, 1999, Hilbert's record no longer contained any "active" disciplinary actions, since the collective

bargaining agreement limited the effect of prior oral or verbal reprimands to one year and the effect

of more serious disciplinary actions to two years. On that day, Hilbert and another corrections officer named Fitzgerald had a serious verbal altercation in front of other staff, inmates, and a local deputy sheriff. Hilbert alleged he was given corrective counseling. The ODRC characterized this interaction as an "informed discussion." Three weeks later, Hilbert was informed that a superior had requested further action against him. When Hilbert asked why he was getting further discipline after counseling had already occurred, the superior told him that Everly had recommended the discipline. The hearing officer in the case found no cause for further discipline. Nonetheless, Warden Anderson gave Hilbert a three-day suspension. Although the grid indicated that anything ranging from a written reprimand to removal was appropriate for the type of offense Hilbert had committed, Andersen justified the suspension by noting that the altercation had taken place in front of inmates and an outside observer. On the "just cause worksheet" sent to the Columbus office, Everly included both one-day suspensions which, according to the collective bargaining agreement, should have been removed from Hilbert's record. Hilbert filed a grievance, but it was dismissed due to an error by his union.

On October 13, 1999, Everly and another employee saw Hilbert yelling at and threatening CO Dale Ponsford. Following another pre-disciplinary hearing, Anderson imposed a five-day suspension, justifying the increased penalty on this being a second offense. Again, on the "just cause worksheet" sent to ODRC's Columbus office, Everly included the two supposedly-expunged suspensions. Hilbert filed a grievance but his later discharge occurred before the grievance could be heard.

On December 21, 1999, Hilbert, off-duty, went back to Grafton and had a Sgt. Donald bring an inmate named Oglesby to Donald's office. Hilbert had heard that Oglesby was spreading a false rumor that Hilbert was trying to date Oglesby's girlfriend. The tenor of this meeting is disputed, but it is clear that Hilbert gave Oglesby an oral warning as opposed to imposing any sort of formal discipline. No immediate discipline for Hilbert resulted from this event.

On January 13, 2000, Hilbert filed a gender- and race-based discrimination claim with the Ohio Civil Rights Commission and the EEOC related to his suspension following the incident with CO Fitzgerald. On February 18, 2000, Hilbert filed a second discrimination claim, this time related to his suspension following the incident with CO Ponsford.

On March 5, 2000, Hilbert loudly cursed at CO Kimberly Senter in front of some other employees and then threw a box of donuts at her. Some of the donuts hit her. Later, in the parking lot, Hilbert asked Senter if she still loved him. Senter complained to the warden, and the next day, Hilbert was placed on administrative leave. Prior to the pre-disciplinary conference, Everly notified Hilbert that he was being written up for both "rousting" inmate Oglesby and for shouting at and threatening Senter. At this time, Hilbert began seeing a psychologist. The psychologist, Eddie Myers, requested and was granted a two-week delay in Hilbert's scheduled pre-disciplinary meeting. After the two-week delay, Myers requested another continuance, but Warden Anderson denied the request and the hearing went forward without Hilbert. The hearing officer found just cause for some, but not all, of the charges. Warden Anderson then terminated Hilbert the next day, on April 6, 2000. While the termination sheet, prepared by Everly, stated that Hilbert was in violation of all the rule infractions with which he had been charged, Warden Anderson testified that

even the limited grounds on which the hearing officer had found just cause for discipline would have been sufficient for Hilbert's termination.

Following his termination, Hilbert filed a third OCRC and EEOC claim, on the basis of retaliation and race-based discrimination inherent in his termination. Hilbert received right-to-sue letters on this claim and the second claim in early May, 2001.

In district court, after voluntarily dismissing some state-law-based claims, Hilbert alleged three claims. First, he argued he was discriminated against on the basis of race, in violation of Title VII, 42 U.S.C. § 2000e-2, via disciplinary proceedings over the course of his career. Second, he claimed his discharge was retaliation, in violation of Title VII, 42 U.S.C. § 2000e-3, both for questioning allegedly racist disciplinary policies and for filing discrimination claims. Finally, he claimed he was denied due process when prison officials refused his psychologist's second request for a continuance of his pre-disciplinary hearing prior to his dismissal.

The district court granted summary judgment for defendants on all three claims, finding (a) that Hilbert had failed to establish a *prima facie* case of discrimination and/or retaliation; (b) that even if Hilbert had made such a case, defendants had asserted non-discriminatory reasons for Hilbert's discipline and termination, and that he had failed to show that these reasons were pretextual; and (c) that offering Hilbert two separate occasions to be heard regarding his potential discipline was sufficient to meet the required due process standard for such employment situations.

Hilbert timely appealed on all issues.

## II.

Like all appeals from a grant of summary judgment, we review Hilbert's claims *de novo*. *See, e.g.*, *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 629 (6th Cir. 2002). We view all the evidence in the light most favorable to the non-moving party, in this case Hilbert. *See, e.g.*, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

**A. Hilbert's Claim of Race- and Gender-Based Discrimination**

Hilbert's first claim, of race- and gender-based discrimination, is governed by the familiar burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Hilbert must first establish a *prima facie* case of discrimination. An employee may do so by introducing direct evidence of intentional discrimination — in such a case statistical evidence can be used if it assists in proving direct individual discrimination. *See, e.g., Huguley v. Gen. Motors Corp.*, 52 F.3d 1364, 1370-72 (6th Cir. 1995). However, such statistical evidence must either on its own, or in conjunction with other evidence, show individualized discriminatory treatment, rather than just a general discriminatory effect as would need to be shown in a disparate impact case. *Id*. at 1372. Alternatively, an employee can prove a *prima facie* case by producing circumstantial evidence of discrimination by showing (1) that he was a member of a protected class, (2) that he suffered an adverse employment action, (3) that he was qualified for the position in question, and (4) that he was replaced by a person outside the protected class or that a similarly-situated individual not from the protected class was treated more favorably than he was. *See, e.g., McDonnell Douglas*, 411 U.S. at 802. If an employee has met the *prima facie* test, then his employer has the burden to produce a legitimate, non-discriminatory reason for its actions. *Id*. Then, the employee has the burden of

showing by a preponderance of the evidence that the reason(s) produced by his employer were merely a pretext for the discrimination. *Id*. at 804-05.

*1. Prima Facie Case*

Hilbert has alleged that Defendants intentionally treated him differently than non-minority employees. He first attempts to argue that he has shown direct individual discrimination via statistical evidence. He offers statistics showing (he claims) that blacks were disproportionally disciplined when their disciplinary records for the year from May 1999 to May 2000 are compared with those of whites. Hilbert did not offer expert testimony to interpret these statistics, and the district court found them to be insufficient to prove Hilbert's *prima facie* case, on the grounds that the statistics merely show a one-year time-slice of discipline at the prison that does not necessarily show any patterns of discrimination. While the district court noted that "where significant statistics are coupled with independent circumstantial evidence of discrimination, the plaintiff has met his burden, . . . and the defendant is not entitled to summary judgment," it found that the statistics were not "significant," and that even if they were, no additional independent circumstantial evidence of direct discrimination had been shown.

It is undisputed that "[a]ppropriate statistical data showing an employer's pattern of conduct towards a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990). However, such data must not only show a significant disparity between two groups, but must also "eliminate the most common nondiscriminatory explanations for the disparity." *Id*.; *see also Gragg v. Somerset Technical Coll.*, 373 F.3d 763 (6th Cir. 2004); *Scott v.*

*Goodyear Tire & Rubber Co.*, 160 F.3d 1121 (6th Cir. 1998)).  Here, there can be little question that

the statistics presented by Hilbert alone do not eliminate any of the several other possible

explanations for the disparity in discipline; even if they do, as he claims, eliminate the possibility

that the difference is due to random chance.  As a result, these statistics alone are, as the district

court determined, insufficient to make a *prima facie* case of intentional discrimination against

Hilbert.

Hilbert also attempts to prove individual discrimination indirectly via the four-part

*McDonnell Douglas* test.  However, since we find that Hilbert has not met the pretext prong of this

test, we need not evaluate his arguments regarding his *prima facie* case.

*2. Reasons for Adverse Employment Actions*

Assuming *arguendo* that Hilbert has properly shown a *prima facie* case of discrimination,

the employer must next put forth non-discriminatory reasons for the discipline at issue.  *See, e.g.,*

*McDonnell*, 411 U.S. at 802.  Warden Anderson has given non-discriminatory reasons for each of

the punishments that occurred after 1998, as follows:

> - As for the three-day suspension for the altercation with CO Fitzgerald, for which
> the punishment range on the grid was "Written Reprimand to Removal," Anderson
> claimed that the suspension was given because the altercation occurred in front of
> inmates, staff, and an outside officer.
>
> - As for the threat against CO Ponsford, for which the punishment range on the grid
> was "Three to five days' suspension to Removal," Anderson noted the earlier three-
> day suspension, and that this punishment was actually near the low end of the given
> range.
>
> - As for the final two acts, against CO Senter and inmate Oglesby, Anderson noted
> that  the combination of infractions made the grid punishment difficult to calculate
> with precision, but that the absolute minimum punishment on only one of the four

charged infractions would have been 5-10 days' suspension. Removal was therefore, he claimed, well within his discretion for the relevant combination of infractions.

*3. Argument That Given Reasons Were Pretextual*

Hilbert does not dispute that Anderson's given reasons for his punishment were non-discriminatory, and thus that the burden shifts back to Hilbert to prove that the given reasons were merely pretextual. *See id.* In order to do so, he must show, by a preponderance of the evidence, that (1) the asserted reasons have no basis in fact, (2) the reasons did not in fact motivate the discipline, *or* (3) if the reasons were actual factors in the disciplinary decision, that they were insufficient on their own to mandate the discipline issued. *See, e.g., Burns v. City of Columbus*, 91 F.3d 836, 844 (6th Cir. 1996). To show that Anderson's reasons were pretextual, Hilbert must set forth evidence on which a reasonable juror could reject the given explanations for the discipline *and* infer that the prison staff intentionally discriminated against Hilbert on the basis of his race. *See, e.g., Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001); *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 519 (1993). This evidence must show more than a dispute as to the reasons for the discipline; rather, it must provide the jury with evidence "that the employer did not honestly believe the proffered non-discriminatory reason[s.]" *Braithwaite*, 258 F.3d at 494 (quotation and citations omitted).

Hilbert presents five different types of evidence in his attempt to show that the given reasons were pretextual, apparently attempting to show that such reasons alone should have been insufficient to warrant the discipline he received.

First, Hilbert again relies on the statistical evidence discussed *supra*. Arguing that the bar is low on a summary judgment motion in the *McDonnell Douglas* context, Hilbert notes that this evidence should be considered by a factfinder at trial to determine its weight. To truly refute the district court's contention that the statistical evidence may result from blacks committing more offenses than whites, Hilbert argues, he would have to produce the disciplinary record of everyone at the prison. However, it seems unlikely that this statistical evidence alone, which does not say anything about the particular offenses Hilbert committed or what Anderson did in his specific case, could ever be sufficient to prove by a preponderance of the evidence that *his* discipline was specifically motivated by racial discrimination, especially given the reasonable explanations for Hilbert's discipline offered by defendants. Nor has Hilbert alleged a disparate impact case, where such statistics would be sufficient to survive summary judgment. *Cf. Griggs v. Duke Power Co.*, 401 U.S. 424 (1971). As a result, we will consider the cumulative effect of this evidence plus any other relevant evidence *infra*. *See, e.g., Burns*, 91 F.3d at 844 (requiring pretext to be shown by a preponderance of the evidence).

Second, Hilbert presented evidence regarding several white COs who were not given discipline above the minimum level required for several offenses. Noting that Hilbert was never given discipline below the minimum required level, and was often given discipline above that level. However, he only argues that one of these employees (Roy Williams) should be considered "similarly situated." As defendants note, courts have long held that merely presenting evidence of non-protected-class employees who received less harsh employment actions cannot be sufficient for proving pretext in an intentional discrimination case. *See, e.g., Wells v. Unisource Worldwide, Inc.*,

289 F.3d 1001, 1007 (7th Cir. 2002) (holding that an employee "cannot establish pretext by pointing to employees who were not similarly situated"). Here, Hilbert has merely selected the disciplined white employees he feels were disciplined less than he was, without showing that any of them were similarly situated. Yet he has not shown that Anderson's given reasons for disciplining him, namely chronic inappropriate conduct and specific multiple repeat offenses of specific rules, applied to the other employees he presents.

Hilbert offers only one employee whom he argues was similarly situated: Roy Williams, a white male who was disciplined on multiple occasions near the time of Hilbert's discipline. In the context of the *prima facie* prong of the *McDonnell Douglas* test, the two parties dispute whether discipline that was issued prior to the period at issue, and which, under the collective bargaining agreement, should have ceased to "have any force or effect" on later disciplinary proceedings, can be considered when determining if an employee is "similarly situated."

The affidavit of Warden Anderson indicated that his disciplinary decisions with regard to Hilbert (more severe than those for Williams) were made on the basis that "throughout the course of Mr. Hilbert's employment with GCI, he was unusually aggressive, argumentative, and confrontational, and increasingly unable to control angry impulses towards others. In 1999 and early 2000, this problem appeared to be getting worse – not better." This indicates that Anderson was likely taking into account prior bad acts from before 1999, which, under the collective bargaining agreement, should have had "no effect." However, regardless of whether the Warden was properly following the rules at issue, Anderson's affidavit does indicate that the two men, at least in the Warden's mind, were *not* similarly situated for reasons other than race. This renders a comparison

of later discipline received by each of the two men difficult. Unlike Hilbert, Williams had *no* prior disciplinary problems before 1999, nor did he appear to have any difficulties with the staff prior to his multiple transgressions between 1999 and 2001 that eventually led to his dismissal. Title VII prohibits discrimination on the basis of race, not discrimination on the basis of acts that a supervisor was not supposed to consider under a collective bargaining agreement. As a result, Williams was not similarly situated for Title VII purposes with regard to the two COs' disciplinary situations, since even if the Warden was not supposed to have considered the prior bad acts, he did.[1]

Other than Roy Williams, none of the other employees Hilbert discusses had disciplinary patterns similar to his own. Nor, while claiming that these employees' cases "reflect an application of policies and procedures by Anderson and Everly that favored white employees," does he show any other *black* employees who were punished in the same way he was, in contrast to the white employees. As a result, it is difficult to see how Hilbert's presentation of the "other employee" evidence establishes any sort of racial animus; at most it can be seen as evidence of "animus towards Hilbert specifically," which is not prohibited by Title VII.

Third, Hilbert alleges that Everly specifically used prior acts against him which were supposed to have been expunged from his file. Yet, except for one incident, all of the testimony in the case consistently shows that Anderson's decisions regarding Hilbert's discipline were made without seeing the "just cause worksheets" prepared by Everly, and even if Anderson did once

---

[1]One response to this logic might be that perhaps Anderson systematically used prior offenses against blacks but not against whites. However, Hilbert has never alleged this, nor has he provided evidence of another white employee with similar prior offenses that were not used against him/her in later proceedings. Therefore there is no evidence to support this contention.

consider this prior discipline (he states he did not, but this fact is disputed), such consideration would not evince any sort of racial animus on his part. Further, though it is true that these worksheets were sent to the Columbus office, where the ODRC reviewed all disciplinary actions, it is undisputed that the ODRC almost never reversed a disciplinary decision by a warden. And even without this, Hilbert fails to show how Everly's alleged acts affected Anderson's at-issue punishment decisions. Thus this evidence also does not demonstrate that the disciplinary decisions at issue were merely a pretext for race-based discrimination.

Fourth, Hilbert notes that Anderson and Everly "took an active role in disciplining Hilbert," several times overriding the disciplinary recommendations of lower officers to impose harsher discipline. Hilbert thus argues that "Appellees' active participation in creating charges against Hilbert demonstrates that a bias existed against Hilbert which may be explained by race." However, this conclusion does not logically follow. Hilbert does not present any evidence that Everly and Anderson did not routinely overrule lower officers in the cases of other (white or black) officers, nor does he present any evidence that such intervention by Everly (a Native American female) and Anderson (a black male), even if out of the ordinary, was motivated by race. This evidence might indicate an interest in Hilbert's case, but in no way does it indicate that the given reasons for disciplining Hilbert were pretexts for race-based discrimination.

Finally, Hilbert notes that he "voiced concerns" about racial bias at Grafton to Anderson and Everly, and that each of them responded in a way that could indicate racial animus. But only two of these responses could even remotely be interpreted as evincing racial animus, and both of these were spoken by Everly. It is unclear how these statements by Everly relate to the disciplinary

decisions made by Anderson, a black male. As a result, we find these statements are not evidence of pretext in Anderson's decisions in Hilbert's case, nor do they evince any racial animus underlying these decisions.

In the end, after considering all of the pretext evidence presented by Hilbert, we are left with only two items that possibly implicate race: the statistical disparity in punishment and two facially-neutral but possibly-biased statements by Everly, who was not the decision-maker. It seems highly unlikely, even viewing these pieces of evidence in the light most favorable to Hilbert, that any reasonable factfinder could find that this evidence proves that the reason Anderson imposed any particular punishment was because of some sort of race-based animus. This is especially so in light of the undisputed evidence that Hilbert committed the acts at issue and that all punishments were within the appropriate grid levels. This does not mean that Anderson and Everly were not biased against Hilbert; they may very well have been. But bias against Hilbert does not equate to bias against all members of a racial minority. Finally, none of this evidence could show, by a preponderance of the evidence, that Anderson did not honestly believe the reasons he gave for the discipline he imposed, or that his stated reasons were merely a pretext for discrimination against African-American COs. As a result, regardless of whether or not Hilbert proved his *prima facie* case, he has not presented sufficient evidence such that a factfinder could find that Anderson's given reasons were pretextual, nor has he met the ultimate burden in this case of proving that he was the victim of intentional race-based discrimination. We therefore **AFFIRM** the district court's holding on this claim.

**B. Hilbert's Claim of Race- and Gender-Based Retaliation**

- 17 -

Next, Hilbert claims that because he filed race-based discrimination claims, he was fired in violation of 42 U.S.C. § 2000e-3, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. The parties dispute which claims we may properly hear, but, as noted below, this is irrelevant, since Hilbert cannot show pretext on any of his retaliation claims. The same Title VII burden-shifting scheme applies in retaliation cases. "In order to find a *prima facie* case of retaliation under Title VII a plaintiff must prove by a preponderance of the evidence: 1) plaintiff engaged in activity protected by Title VII; 2) plaintiff's exercise of such protected activity was known by defendant; 3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and 4) that there was a causal connection between the protected activity and the adverse employment action." *DiCarlo v. Potter*, 358 F.3d 408, 420 (6th Cir. 2004) (citations omitted). If a *prima facie* case is proven, then the same last two steps apply as in discrimination cases. The parties dispute only the fourth prong from *DiCarlo*, namely, causality. Here, the district court assumed *arguendo* that Hilbert had proven a *prima facie* case without deciding the issue as to the fourth (causality) prong, but then found that Hilbert had not proven pretext.

The district court was correct. Regardless of whether the close temporal proximity of Hilbert's EEOC claims and his termination requires a presumption of a causal connection between the two, the defendants here have stated sufficient non-retaliatory reasons for discharging Hilbert: namely, his repeated disciplinary violations. Both defendants and Hilbert agree that the same evidence and same analysis applies to the retaliation claim as in the discrimination claim, and Hilbert has not introduced any additional evidence of pretext on his retaliation claims. Therefore,

a finding against Hilbert on pretext as to racial discrimination requires a finding of no pretext here.

We therefore **AFFIRM** the district court's holding on this count.

**III.**

Finally, Hilbert claims he was deprived of his constitutional right to due process when the prison refused to grant his second request for a two-week continuance of his pre-disciplinary hearing when he was under the care of a psychologist. The Supreme Court, in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), held that "due process requires 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected interest in his employment." *Id*. at 542. However, the required hearing need not be formal or have any sort of complicated evidentiary rules or a neutral factfinder; rather, all that is generally required is an "oral or written notice of the charges, . . . an explanation of the employer's evidence, and the opportunity to present [the employee's] side of the story." *Id*. at 546; *see also, e.g., Gillard v. Norris*, 857 F.2d 1095, 1099-1100 (6th Cir. 1988) (holding that an opportunity to present only written evidence to a non-neutral factfinder was sufficient to satisfy due process); *Leary v. Daeschner*, 228 F.3d 729, 744 (6th Cir. 2000) (holding that where plaintiffs were offered, but refused to participate in, a hearing scheduled for only several hours after discipline was imposed, due process was satisfied); *Garraghty v. Jordan*, 830 F.2d 1295, 1302 (4th Cir. 1987) (holding that an informal conference with a superior was sufficient process and noting that "[r]ealities of the work place, especially in the paramilitary environment of corrections departments, require that authority be respected and that discipline be swift."). In addition, the required pre-deprivation process is further lessened when an employee is "otherwise provided an opportunity to respond at a meaningful time and in a meaningful

manner." *Brock v. Roadway Express*, 481 U.S. 252, 266 (1987) (Op. of Marshall, J.). As a result,

a plaintiff alleging a due process violation in such a situation must show that he was not provided

the most basic notice of the charges, description of the evidence against him, and some opportunity

to tell his side of the story. *See, e.g., Buckner v. City of Highland Park*, 901 F.2d 491, 497 (6th Cir.

1990) (noting that requirements of elaborate termination proceedings would hamper a city's interest

in quickly removing an unsatisfactory employee). *See also Loudermill*, 470 U.S. at 543. The

*Loudermill* Court used the familiar interest-balancing test of *Mathews v. Eldrige*, 424 U.S. 319

(1976), to determine if a particular pre-deprivation proceeding is warranted, and noted that the key

purpose of pre-deprivation hearings is to minimize erroneous terminations. *See id*. The interests

to balance are (1) the employee's interest in retaining employment, (2) the governmental interest in

the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens,

and (3) the risk of an erroneous termination. *Mathews*, 424 U.S. at 335.

Here, neither side disputes that Hilbert was given proper notice of the case or evidence

against him. Nor does either side dispute the existence of significant post-termination grievance

procedures. The only question is whether he was offered a meaningful opportunity to respond.

Hilbert claims that, since he was under medical care at the time, and since the prison has not shown

how it would be prejudiced by delaying his hearing, he was not offered any sort of meaningful

opportunity to respond to the charges against him. The State argues that "the due process clause

does not require that a public employee retain his job for so long as he can find a health care

provider willing to opine that the employee is not ready to personally attend a hearing." The State

also notes that Hilbert's doctor was by no means certain that he would be able to work by April 15,

2000 — though the doctor's letter requested a second rescheduling of the hearing for April 15th, it also indicated that the doctor was planning to examine Hilbert on April 13th, and would inform the prison on the 14th if Hilbert would be able to return on the 15th. The State argues that it had a significant financial and administrative interest in not continuing to employ this employee whom it had found to be unsatisfactory, especially when the length of Hilbert's disability was uncertain and since he was receiving workman's compensation at the time (which overrode his suspension without pay). The district court found against Hilbert, claiming that he had been given an opportunity to appear, and that the fact that he had declined to respond, whether in person, in writing, via counsel or via a union representative, did not mean he did not have the opportunity to do so.

In *Buckner v. City of Highland Park*, 901 F.2d 491 (6th Cir. 1990), this Court held that two visits to a hospital room by a supervisor, accompanied by a union representative, constituted adequate process when the employee (who had been hospitalized for treatment for alcoholism) refused to respond to questions about the incident at issue. However, the court noted specifically as a basis for its holding that "Buckner was not suffering from any mental or physical disability which prevented him from offering his response to the complaint." *Id*. at 495. Here, Hilbert's psychologist's testimony (via his letter) that Hilbert was unable to attend the hearing is unrefuted. However, Hilbert never attempted to obtain a union representative who could appear on his behalf, *see, e.g., Smith v. United States Postal Serv.*, 789 F.2d 1540, 1543 (Fed. Cir. 1986), nor did he ever show that he would be unable to testify in writing or in any way cooperate with a witness or representative who could have appeared on his behalf. Indeed, though his doctor's letter states that Hilbert would be unable to return to work until two weeks after the second scheduled hearing,

Hilbert never produced any evidence, either to prison officials or in district court, that his psychological condition precluded him from providing his side of the story to any party other than his psychologist. In addition, the state notes that it has an "interest in the expeditious removal of unsatisfactory employees," especially those receiving ongoing payment from state funds. As a result, the balancing factors from *Mathews* weigh in the State's favor, especially given the availability of significant post-deprivation procedures and the paramilitary environment of the corrections institution. Therefore, we **AFFIRM** the district court's holding on Hilbert's due process claim.

## IV.

For the reasons stated above, we **AFFIRM** the district court's grant of summary judgment to defendants.