**FILED**

*Oct 30, 2012*

DEBORAH S. HUNT, Clerk

File Name: 12a1116n.06

NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

No. 10-4161

**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

NOEL WILLIAMS,

      Plaintiff-Appellant,

v.

KIMBERLY ZURZ, in her official and personal capacities;
OHIO DEPARTMENT OF COMMERCE,

      Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

_____ /

BEFORE:    KEITH, MARTIN, and BOGGS, Circuit Judges.

      BOYCE F. MARTIN, JR., Circuit Judge. Noel Williams sued the Ohio Department of Commerce and its Director, Kimberly Zurz. Williams asserted violations of federal and state statutes prohibiting discrimination and retaliatory actions based on race and speech protected by the First Amendment to the United States Constitution. The district court granted the Defendants' motion for summary judgment on all claims. For the following reasons, we **AFFIRM** the judgment of the district court.

**I.**

      Williams began working for the Department as a paralegal assistant in the Division of Securities in 1994. Though her position changed over the years, Williams worked in the same

division until her termination. Since 2004, Williams has also been the President of the Central Ohio Chapter of the National Association for the Advancement of Colored People ("NAACP"). As a state employee, Williams was also a member of the Ohio Civil Service Employee Association, AFSCME Local 11.

On May 24, 2007, the Department's Chief Information Officer learned that another employee of the Department, Rozland Flax, had likely accessed secured files pertaining to Ohio's Foreclosure Task Force and forwarded the files to Williams. The Foreclosure Task Force was created in March 2007 by Governor Ted Strickland and chaired by Zurz. The files accessed belonged to Zurz. The Chief Information Officer reported the incident to Chase Canfield, the Department's Human Resources Director, who reported the incident to Zurz.

On May 25, Flax and Williams were placed on paid administrative leave pending the outcome of an internal investigation into the accessing of Zurz's files. By letter, Williams was placed on administrative leave and directed to remain at home in a "work-ready" status during her regular scheduled work hours, in accordance with Department policy. Canfield conducted the internal investigation, during which he found that Williams had not engaged in misconduct by receiving the files because the files were not actually secured and were accessible to the majority of users within the Department. In the course of the investigation, an analysis of Williams's computer revealed that Williams engaged in a "high degree of non-work-related Internet access." The Department's Computer Use Policy prohibited non-work-related Internet use and Williams had previously been disciplined for computer misuse in 2006 when she emailed a pornographic cartoon to a coworker.

On June 4, 2007, while Williams was still on administrative leave, Williams met with John Haseley, the Ohio Governor's Chief of Staff. According to Williams, at this meeting she spoke to Haseley about her concerns regarding disparities in minority hiring, promotion, retention, and discipline in the Department, and suggested names of minorities, including herself, for inclusion on the Foreclosure Task Force.

On July 13, Canfield interviewed Williams in connection with his investigation, which had expanded to include a review of the new suspected violations of the Computer Use Policy and other suspected policy violations. Canfield—who had apparently learned about Williams's meeting with Haseley—asked Williams about her email use, the timing of her meeting with Haseley as it related to her regular work hours, and other suspected infractions of Department policy. On July 26, Zurz sent an email to Haseley inquiring about the "nature" of Williams's June 4 meeting with Haseley. Katie Jones, the Governor's Administrative Assistant, responded to Zurz's email and—at Haseley's instruction—stated that the meeting covered issues including the Columbus NAACP's personnel recommendations for positions within Ohio government and for appointments to the Foreclosure Task Force and the May 25 letter informing Williams that she had been placed on paid administrative leave. According to the email from Jones, Williams shared a copy of the May 25 letter with Haseley.

Canfield prepared a report of his investigation, which identified instances when Williams violated Department policy by engaging in non-work-related internet access, working in excess of scheduled hours without authorization, and falsifying her time sheets. The report concluded that, while on administrative leave, Williams attended the meeting with Haseley during her regularly

scheduled work hours, without the prior authorization of her supervisor, in violation of the Department's paid administrative leave policy. Williams's attendance at the meeting caused her to be out of her home in excess of the allotted thirty minutes of Williams's lunch hour. This was in violation of the letter placing Williams on administrative leave, which required her to remain at home, in work-ready status, during her leave. There was also conflicting evidence about whether she met with her union representative during her regular work hours while on leave. Based on Canfield's report, Andrew Shuman, the Department's Labor Relations Officer, conducted a pre-disciplinary hearing with Williams on August 15. Shuman recommended to Zurz that Williams be terminated; Zurz decided to terminate Williams. On August 30, Zurz terminated Williams on four grounds: (1) insubordination during her paid administrative leave; (2) violation of the Computer Use Policy; (3) falsifying time sheets; and (4) working in excess of scheduled hours without authorization.

Williams grieved her termination through the Ohio Civil Service Employee Association and the applicable collective bargaining agreement. William Anthony was assigned to represent the Ohio Civil Service Employee Association during the arbitration of Williams's grievance. Anthony testified that, during this process, he met with Zurz to discuss the possibility of Zurz rescinding Williams's termination. According to Anthony, Zurz told Anthony that Williams "was being terminated because [Williams] has too much 'power' and that [Zurz] is Director of [the] Department of Commerce; that [Zurz] needs to send a message to employees that [Zurz] is the one with the 'power.'" According to Anthony, Zurz also stated that, "despite the stated reasons for the

termination, Ms. Williams was really being terminated for bypassing [Zurz] and going to the Office of the Governor." After arbitration, Williams's termination was upheld for just cause.

On February 25, 2008, Williams filed this action before the district court, alleging violations of state and federal law by Zurz, the Department, and John Does. Williams subsequently filed an amended complaint asserting additional claims for relief. Williams's amended complaint asserted claims of racial discrimination in violation of 42 U.S.C. § 1981; racial discrimination, hostile work environment, and retaliation in violation of Ohio law; wrongful discharge in violation of Ohio public policy; deprivation of U.S. Constitutional rights in violation of 42 U.S.C. § 1983; conspiracy in violation of 42 U.S.C. § 1985(3); First Amendment retaliation; and equal protection violations of the Ninth and Fourteenth Amendments of the U.S. Constitution. Zurz and the Department moved for summary judgment on all claims. In her reply, Williams abandoned all claims except those "under section 1981/1983, and First Amendment retaliation." The district court granted summary judgment to Zurz and the Department, finding that Williams could not make the prima facie case for her race discrimination claims pursuant to sections 1981 and 1983 because she did show that she was treated differently from similarly situated employees and that Williams could not prevail on her First Amendment claim because she had failed to demonstrate the required causal link between her protected activity and her termination. Subsequently, Williams filed a motion seeking relief from judgment, and the district court denied the motion.

On appeal, Williams argues that the district court erred in granting summary judgment on: (1) her claim of retaliation in violation of the First Amendment; (2) her claim of race retaliation pursuant to sections 1981 and 1983; (3) her claim of race discrimination pursuant to sections 1981

and 1983; and (4) Zurz's claim of qualified immunity. Zurz and the Department argue that summary judgment on these claims was proper. We affirm the judgment of the district court.

## II.

This Court "review[s] a district court's grant of summary judgment *de novo*." *Binay v. Bettendorf*, 601 F.3d 640, 646 (6th Cir. 2010). Summary judgment is proper if the materials in the record "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the factual evidence and draw all reasonable inferences in favor of the nonmoving party." *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 892 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## A. Retaliation

Williams argues that the district court wrongfully granted summary judgment to Defendants on her First Amendment retaliation and her "expressive association" retaliation claim. She also argues that she stated a claim for "race retaliation" pursuant to sections 1981 and 1983 that should have survived summary judgment. All three of Williams's retaliation claims are based on her assertions that she was terminated in retaliation for statements she made during her June 4 meeting with Haseley and for her expressive association with the NAACP.

To prevail in a claim of retaliation for activity protected by the First Amendment, Williams must show that: "(1) [she] was participating in a constitutionally protected activity; (2) the defendant's action injured [Williams] in a way likely to deter a person of ordinary firmness from further participation in that activity; and (3) the adverse action was motivated at least in part by

[Williams's] protected conduct." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 371 (6th Cir. 2011). If the plaintiff meets this initial burden, it then falls to the employer to show that it would have reached the same decision to terminate the employee even in the absence of the protected speech. *Id.* Once the employer presents this evidence, "summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010). Expressive association retaliation claims follow the same framework as other First Amendment retaliation claims, *see Akers v. McGinnis*, 352 F.3d 1030, 1036 (6th Cir. 2003), and the claims follow the same framework regardless of whether raised pursuant to section 1981 or 1983. *See, e.g.*, *Hilbert v. Ohio Dep't of Rehab. & Corr.*, 121 F. App'x 104, 114 (6th Cir. 2005) (applying the same analytical framework to retaliation claims brought pursuant to sections 1981 and 1983).

As a public employee, Williams is entitled to First Amendment protection if she spoke "as a citizen" while addressing "a matter of public concern." *Connick v. Myers*, 461 U.S. 138, 146-47 (1983); *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 349 (6th Cir. 2010). Williams must also show that the Department "'had no overriding state interest in efficient public service that would be undermined by [her] speech.'" *Murphy v. Cockrell*, 505 F.3d 446, 449 (6th Cir. 2007) (quoting *Silberstein v. City of Dayton*, 440 F.3d 306, 318 (6th Cir. 2006)).

Assuming without deciding that Williams has demonstrated that she engaged in protected activity during her meeting with Haseley, and because her termination was an adverse employment action, we consider whether she has established a causal link between these two events. To establish

the third prong, *i.e.*, causation, Williams must "point to specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003) (internal quotation marks omitted). "A causal link can be shown through direct or circumstantial evidence, including showing temporal proximity between engaging in protected activity and suffering an adverse employment action that may create an inference of causation." *Eckerman*, 636 F.3d at 209. Williams contends that she has shown causation based on: (1) the temporal proximity between Zurz learning of the substance of Williams's meeting with Haseley and Zurz's decision to terminate Williams; and (2) Zurz's statement to Anthony that "despite the stated reasons for the termination, Ms. Williams was really being terminated for bypassing her and going to the Office of the Governor." Williams argues that Zurz learned about the substance of Williams's meeting with Haseley only thirteen days before Zurz decided to terminate her. Williams contends that, if Anthony's testimony is credited, then the reasons given by Zurz and the Department for terminating Williams—her violations of Department policies—are pretextual.

"[W]e have accepted temporal proximity as a valid basis from which to draw an inference of retaliatory motivation under limited circumstances . . . . Specifically, the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement [her] claim with other evidence of retaliatory conduct to establish causality." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (citations and internal quotation marks omitted). This Court has found a temporal gap of only twenty-one days "is significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive." *DiCarlo v. Potter*, 358 F.3d 408, 422 (6th Cir. 2004). "In analyzing the facts in temporal proximity

cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn," and we assess each case individually. *Vereecke*, 609 F.3d at 401.

We conclude that Zurz has failed to meet the third prong of her retaliation claims because she has not presented "specific, nonconclusory allegations reasonably linking her speech to employer discipline." *Rodgers*, 344 F.3d at 602 (internal quotation marks omitted). The only evidence of what and when Zurz knew about the nature of Williams's meeting with Haseley is Jones's email sent on July 26. But Zurz was placed on administrative leave on May 24, well before her meeting with Haseley; the Department's investigation, which led to the discovery of other suspicious computer activity and other potential infractions, was initiated on May 24. On July 13, Canfield met with Williams to collect more information about the evidence of internet-use violations, the length of her meeting with Haseley, and the other alleged infractions. On August 8, thirteen days after Zurz communicated with Jones about the June 4 meeting, Shuman issued a note that a pre-disciplinary meeting would be held on August 15. It was not until August 28, in light of the pre-disciplinary meeting, that Shuman recommended Williams be disciplined. Zurz acted on that recommendation and decided to terminate Williams on August 29. Thus, more than one month had elapsed between the date Zurz received the email and the date Zurz decided to terminate Williams.

"Substantial case law from this [C]ircuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone." *Vereecke*, 609 F.3d at 400. This case is distinguishable from others where we have found that proximity in combination with other factors shows causation. For example, we have held that a temporal proximity of three months, in

combination with increased scrutiny of the employee by the employer, is sufficient to show causation at the summary judgment stage. *See Hamilton v. Gen'l Elec. Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009). We have also found that a temporal proximity of just under three months, in combination with verbal threats of termination, was enough to demonstrate a causal link. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). Indeed, we have found that temporal proximity alone is "enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation" only when "an adverse employment action occurs very close in time after an employer learns of a protected activity." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (finding temporal proximity to be sufficient evidence of causation where termination occurred on the same day as employer learned of protected conduct). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*; *see also Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (finding that temporal proximity of "two to five months" between protected conduct and adverse action is insufficient); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (finding that, where employer filed disciplinary notices only weeks after protected conduct and discharged plaintiff within four months of the protected conduct, temporal proximity is insufficient to support an inference of retaliation).

In this case, while Zurz knew that Williams had conveyed personnel recommendations for positions within the Ohio government and on the Foreclosure Task Force on behalf of the Columbus NAACP, there is no evidence beyond the one-month temporal proximity that this speech was a factor

in Zurz's decision to fire Williams. Additionally, the concern about Williams's computer misuse predates her alleged protected activity. Furthermore, there is no evidence that Zurz had knowledge of any of the criticisms Williams allegedly voiced against her employer during her meeting with Haseley. Unlike cases where we have found that temporal proximity in combination with other factors demonstrates causation, here Williams has not identified evidence outside of the temporal gap to show causation. Given the circumstances here—the lack of evidence showing that Zurz knew of any racially motivated concerns articulated by Williams during her meeting with Haseley, and the fact that an investigation into the misconduct for which Williams was ultimately terminated was already underway well before the allegedly protected statements were made—we conclude that the temporal proximity alone here does not show causation.

Zurz's statement that Williams had "too much power" and "just leapfrogged over . . . just went over [Zurz] and went to the Governor's office, ran trying to get her job back," does not suggest that Williams was terminated in retaliation for any alleged First Amendment activity. Indeed, given that Williams has not provided evidence showing that Zurz or others in the Department were aware of any part of Williams's conversation with Haseley that may have had to do with discrimination, diversity, or disparate treatment, and in light of the evidence before us, this statement can only reasonably be interpreted to refer to Zurz's frustration that Williams raised the issue of her administrative leave with Haseley.

Viewing the evidence in the light most favorable to Williams, she has not established facts reasonably linking her alleged First Amendment activity to Zurz's decision to terminate her employment. Because Williams has failed to establish a causal link sufficient to show that her

alleged First Amendment activity was a motivating factor in her discharge, she has failed to make a prima facie showing of retaliation for protected activity; we find that the district court did not err in granting the Defendants' motion for summary judgment on the retaliation claims.

Williams also argues that the district court erred in failing to address her "race retaliation" claim pleaded pursuant to sections 1981 and 1983. The district court did not address any retaliation claims raised pursuant to sections 1981 and 1983 in its order granting the Defendants' motion for summary judgment. In its denial of Williams's motion for relief from judgment, the district court explained that it did not address any such claim because it found Williams's claims under section 1981 and 1983 were pleaded as discrimination claims and not as retaliation claims. According to Williams, she alleged "race retaliation" by Defendants in response to Williams's "rais[ing] concerns about discrimination against African-Americans in state government" during her meeting with Haseley, and in response to her expressive association with the NAACP. As explained above, Williams has failed to demonstrate a causal connection—a required element of any retaliation claim—between her statements to Haseley, her association with the NAACP, and her termination. Therefore, we affirm the district court's judgment granting the Defendants' motion for summary judgment on Williams's retaliation claims, including her "race retaliation" claim.

**B.      Race Discrimination**

Williams claims that her termination was motivated by discriminatory animus based on her race and by her raising concerns about discrimination against African-Americans in the Ohio government. She argues that the district court erred both by dismissing her claim of race discrimination and by failing to resolve her discrimination claims under the mixed-motive

framework. Defendants argue that the mixed-motive analysis applied to Title VII claims does not apply to claims brought pursuant to section 1981.

Generally, discrimination claims raised pursuant to sections 1981 and 1983 are governed by the legal framework used to analyze claims under Title VII of the Civil Rights Act of 1964. *See Smith v. City of Salem, Ohio*, 378 F.3d 566, 577 (6th Cir. 2004) (applying the Title VII framework to section 1983 claims); *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001) (applying the Title VII framework to section 1981 claims). Section 1981 prohibits racial discrimination as well as "discrimination based on association with or advocacy for non-whites." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009). To show discrimination, the plaintiff must present either "direct evidence of discrimination" or "circumstantial evidence that would allow an inference of discriminatory treatment." *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 514 (6th Cir. 2003). "Discrimination claims brought pursuant to [Title VII] are traditionally categorized as either single-motive claims, *i.e.*, where an illegitimate reason motivated an employment decision, or mixed-motive claims, *i.e.*, where both legitimate and illegitimate reasons motivated the employer's decision." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008).

The district court analyzed Williams's claim as a single-motive claim. The court determined Williams failed to come forward with direct evidence of discrimination—a finding Williams does not challenge on appeal—and therefore analyzed Williams's race discrimination claims under the tripartite burden-shifting framework first announced by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The district court determined that Williams failed to show a prima facie case of race discrimination. The district court applied the same analysis to

both her section 1981 and section 1983 discrimination claims. Williams argues that the application of the *McDonnell Douglas* framework to her discrimination claim was error because the district court should have instead applied a mixed-motive analysis.

In cases involving circumstantial evidence, this Circuit has long applied the tripartite burden-shifting *McDonnell Douglas* framework. *See, e.g.*, *White*, 533 F.3d at 391. Under *McDonnell Douglas*, "[t]he burden is first on the plaintiff to demonstrate a prima facie case of race discrimination; it then shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to show pretext—*i.e.*, that the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). In *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100-01 (2003), however, the United States Supreme Court made clear that plaintiffs can pursue mixed-motive Title VII claims based solely on circumstantial evidence. Subsequent to *Desert Palace*, our Circuit stated that the *McDonnell Douglas* standard "does *not* apply to the summary judgment analysis of [these] Title VII mixed-motive claims." *White*, 533 F.3d at 400. Instead, to overcome a defendant's motion for summary judgment, "a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was *a* motivating factor' for the defendant's adverse employment action. *Id*. (quoting 42 U.S.C. § 2000e-2(m)).

Williams argues that the mixed-motive standard is appropriate in this case and that *McDonnell Douglas* does not apply to her claim. Although this Court has repeatedly stated that section 1981 and Title VII share the same prima facie test, this Court has also held that, while *Desert*

*Palace* establishes a mixed-motive standard for Title VII claims, it "does not modify *McDonnell Douglas* in employment discrimination lawsuits filed under [section] 1981." *Aquino v. Honda of America, Inc.*, 158 F. App'x 667, 676 (6th Cir. 2005) (per curiam); *but see Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 757 (6th Cir. 2012) (applying the mixed-motive standard to claims raised pursuant to section 1981 and Title VII). Regardless of whether we analyze Williams's claims under the mixed-motive standard articulated in *Desert Palace* or the burden-shifting framework of *McDonnell Douglas*, Williams has failed to meet her burden to overcome Defendants' motion for summary judgment on her race discrimination claims.

"[T]he ultimate question at summary judgment on a mixed-motive case is whether the plaintiff has presented evidence, direct or circumstantial, from which a reasonable jury could logically infer that a protected characteristic was *a motivating factor* in the defendant's adverse employment action against the plaintiff." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 713 (6th Cir. 2006) (alterations omitted) (citation and internal quotation marks omitted). Williams argues first that Zurz's statement to Anthony that Williams was terminated because "she has too much 'power'" shows that racial discrimination was a motivating factor in Zurz's decision to terminate Williams. As noted above, however, Zurz's alleged statements to Anthony were unrelated to race. Indeed, Anthony testified that Zurz stated that she was upset that Williams "leapfrogged" over Zurz by going to the Governor's office to "try[] to get her job back" while on administrative leave. Zurz's statements to Anthony, even when interpreted in the light most favorable to Williams, do not relate to Williams's race or her association with the NAACP.

Williams also argues that the short time between when Zurz learned about the nature of Williams's meeting with Haseley and when Zurz decided to terminate Williams is evidence of discriminatory motive. The only evidence in the record about Zurz's knowledge of Williams's meeting with Haseley is the July 26 email to Zurz from Jones. Jones indicates that, at the June 24 meeting, Williams conveyed to Haseley the Columbus NAACP's recommendations for positions within the Ohio government and for appointments to the Foreclosure Task Force. Williams also provided a copy of her administrative-leave notice to Haseley. The email does not refer to the concerns that Williams allegedly conveyed about the lack of minority representation in upper-level management in the Department, on the Foreclosure Task Force, or in the Ohio government more generally. Moreover, by the time Jones sent the email, Williams had been on leave for over a month, and the Department had already identified and begun an investigation into the infractions for which she was ultimately terminated. The investigation of Williams's computer usage had been initiated on May 24, several weeks before Williams met with Haseley. As explained above in the context of Zurz's retaliation claim, the one-month proximity between Zurz learning about the nature of Williams's meeting with Haseley and Zurz's subsequent decision to terminate Williams is not enough by itself to create a question of fact about Zurz's motive for terminating Williams. *Cf. Mickey*, 516 F.3d at 525 (stating, in the context of a retaliation claim, that "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality."). Because Williams has not established a genuine issue of material fact as to whether an unlawful factor motivated her termination as required under the mixed-motive standard,

any error in the district court's refusal to apply a mixed-motive standard to this claim would have been harmless.

Likewise, Williams's claims fails when analyzed as a single-motive claim. Under *McDonnell Douglas*, Williams must establish a prima facie case of discrimination by showing that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees. *See Murray Guard*, 455 F.3d at 707. Zurz and the Department concede that Williams has met her burden on the first three of the four elements. Williams has made no effort in the district court or on appeal to make a showing of the fourth element, and so she has failed to state a prima facie case of discrimination. *See id.* at 709-10. We conclude that the district court did not err in granting summary judgment to Defendants on Williams's claims of racial discrimination.

## C.    Qualified Immunity

Because Williams has not demonstrated that a violation of her constitutional or statutory rights occurred, we agree with the district court that Zurz is entitled to qualified immunity. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (internal quotation marks omitted)).

III.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.