*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0177p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CHARLES VEREECKE,

                *Plaintiff-Appellant,*

     *v.*

HURON VALLEY SCHOOL DISTRICT; MICHAEL
KRYSTYNIAK; MICHAEL D. TEASDALE, jointly
and severally,

                *Defendants-Appellees.*

> No. 08-2051

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-13700—Nancy G. Edmunds, District Judge.

Argued: October 14, 2009

Decided and Filed: June 18, 2010

Before: GILMAN and GIBBONS, Circuit Judges; ANDERSON, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Rick J. Patterson, POTTER, DeAGOSTINO, O'DEA & PATTERSON, Auburn Hills, Michigan, for Appellant. Kevin T. Sutton, LUSK & ALBERTSON, Bloomfield Hills, Michigan, for Appellees. **ON BRIEF:** Rick J. Patterson, Steven M. Potter, POTTER, DeAGOSTINO, O'DEA & PATTERSON, Auburn Hills, Michigan, for Appellant. Kevin T. Sutton, Robert A. Lusk, LUSK & ALBERTSON, Bloomfield Hills, Michigan, Carl F. Jarboe, ABBOTT NICHOLSON, P.C., Detroit, Michigan, for Appellees.

---

[*]The Honorable S. Thomas Anderson, United States District Judge for the Western District of Tennessee, sitting by designation.

————————————

**OPINION**

————————————

JULIA SMITH GIBBONS, Circuit Judge. Plaintiff-appellant Charles Vereecke, a high school English teacher at Milford High School ("Milford"), appeals the district court's grant of summary judgment for defendants-appellees Michael Krystyniak, Michael Teasdale, and the Huron Valley School District on Vereecke's claim that the defendants unlawfully retaliated against him for exercising his First Amendment rights. In October 2006, Vereecke filed a lawsuit on behalf of his daughter, alleging that a teacher had broken her wrist while engaged in attempted horseplay and that the school had previously failed to investigate harassment complaints against the teacher. Vereecke alleges that, in direct retaliation for having filed that suit, the defendants issued multiple reprimands to him, removed him from his position on the high school's Hall of Fame Committee, declined to renew his contract as the athletic coordinator, and initiated a larceny investigation by the police against him. The district court found that Vereecke was unable to present evidence that the underlying lawsuit was a substantial or motivating factor in the defendants' decisions to discipline him and granted summary judgment for the defendants. For the reasons that follow, we affirm.

I.

A.

Charles Vereecke has been an English teacher at Milford High School, part of the Huron Valley School District, for over thirty-five years. For the time relevant to the case, defendant Michael Krystyniak was the principal of Milford, and Sean Maloney was the school's athletic director. Defendant Michael Teasdale worked for the school district as the Executive Director of Human Resources, and the district superintendent was Jackie Johnston.

Until the fall of 2006, Vereecke's professional record was unblemished. In addition to his duties as a teacher, Vereecke also had held the position of athletic

coordinator at Milford for over twenty years. As athletic coordinator Vereecke coordinated and hosted athletic competitions with other schools. The position of athletic coordinator is considered an extracurricular activity, separate from regular teaching duties, and Vereecke was paid nearly $8,000 per year in addition to his annual salary for serving in the position. His service as the athletic coordinator was an at-will position that did not affect tenure. Terms of the appointment were contained in a contract, renewable annually. Vereecke further served as one of ten members of the Milford High School Hall of Fame Committee as the designee of Krystyniak. The primary purpose of the committee was to meet once a year to discuss and vote on that year's nominees to the Hall of Fame. Vereecke was not paid to serve on this committee.

## B.

On October 11, 2006, Vereecke, on behalf of his daughter, Kelly, who was also a student at Milford, filed a lawsuit in Michigan state court against the Huron Valley School District, Krystyniak, and a former teacher at Milford, Charles Stolz. In addition to alleging that Stolz broke his daughter's wrist, Vereecke claimed Krystyniak was grossly negligent for failing to investigate sexual harassment complaints brought against Stolz by other students. Although the school had decided that Stolz's contract would not be renewed, he was still on duty at the time of the altercation with Kelly in May 2006. Vereecke demanded compensatory damages for Kelly's broken wrist and exemplary damages for her mental anguish. The suit was eventually settled on August 6, 2007.

Although Vereecke did not file the lawsuit until October 11, 2006, in June 2006, he told Krystyniak of his intent to file the suit on his daughter's behalf. Vereecke did not mention, however, that he was planning to name Krystyniak or the Huron Valley School District as defendants. Until he was served on October 19, 2006, Krystyniak believed that Stolz would be the only defendant.

C.

Immediately before and during the pendency of the lawsuit arising from Kelly's injury, a series of confrontations between Vereecke and Milford's administration took place. The facts surrounding these incidents are largely undisputed. Vereecke alleges that he was disciplined after these confrontations because of the suit.

*1. The Basketball Coach Dispute and Removal from the Hall of Fame Committee*

During the 2005–2006 school year, a number of parents of students on the Milford girls' basketball team became angry with the coach of the team, Don Palmer, to the point that they eventually hired an attorney and filed grievances with the administration. One of the parents was Debbie Schultz, who was also a member of the first Milford Hall of Fame class. Schultz began videotaping the basketball games, although, according to Vereecke, she taped only Palmer on the sideline in an attempt to record evidence of his misconduct.

Two of Vereecke's daughters were on the team, but he did not participate in the complaints against Palmer. Vereecke disapproved of Schultz's actions and felt that she should have contacted all the parents of the players on the team, or contacted the coach, before filing a grievance with the superintendent. Vereecke and Palmer were "lifelong friends," so, in a show of support for him, Vereecke wore to basketball games a t-shirt with Palmer's attorney's name and phone number on it.

Vereecke was not alone in disapproving of Schultz's tactics. In August 2006, the Hall of Fame Committee began receiving letters from members of the Milford community, at least three of whom were themselves inducted into the Milford Hall of Fame, expressing their displeasure with Schultz's actions. In early September 2006, Vereecke drafted a letter to Schultz informing her of the letters and that the "Board reserves the right to remove any inductee . . . for conduct detrimental . . . to Milford High School and/or to the Hall of Fame." The letter was signed by Vereecke alone, but below his name Vereecke added "Milford Hall of Fame." Twice, Vereecke asked Krystyniak and athletic director Maloney for permission to send the letter. They advised

him not to send the letter at the first meeting, but remained silent the second time, neither authorizing him to send the letter nor expressly telling him not to. Vereecke viewed their silence as consent to send the letter, so he mailed it to Schultz on September 19, 2006. Vereecke never obtained authorization from the Hall of Fame Committee to send the letter, nor was there a provision in the Committee's bylaws that authorized him to do so.

Upon receiving the letter, Schultz contacted Krystyniak, telling him that both she and her husband were extremely upset by the letter and that they had emailed complaints to the Huron Valley School District's superintendent, deputy superintendent, and director of human resources. On October 2, 2006, the Hall of Fame Committee convened to discuss, among other things, Vereecke's actions. Krystyniak, who was not a member of the committee, attended, asked the members if they had authorized or were aware of Vereecke's letter, and was informed they were not. Krystyniak disagreed with the content of the letter and was displeased with Vereecke's actions, specifically his decision to send the letter "unilaterally." Vereecke filed the underlying lawsuit on behalf of Kelly nine days after this meeting. As noted above, Krystyniak was served with process eight days after that.

Despite attending the meeting in early October, Krystyniak did not take any action against Vereecke until November 17, 2006—roughly a month after Kelly Vereecke's suit was filed. On that date, Krystyniak sent a letter to Vereecke chastising him for having "failed to model, utilize, or demonstrate the appropriate conduct necessary for the Athletic Coordinator position." It cited the letter to Schultz and Vereecke's overt support for Palmer as indicative of inappropriate conduct. In the end, Vereecke was removed from his position as the principal's designee to the Hall of Fame Committee, and his "position as Athletic Coordinator [was] changed with reduced 'visibility' and [his] professional conduct placed under review for the remainder of the school year." This letter was Vereecke's first written reprimand or discipline of any kind in over thirty years of teaching.

Before reprimanding Vereecke, Krystyniak got input from Teasdale. In his deposition, Teasdale explained that "reduced visibility" meant Vereecke would not be the public face of the school at athletic events. Teasdale understood the "professional conduct" mentioned in the letter to refer to the manner in which Vereecke handled himself as the athletic coordinator. Maloney states in an affidavit that Krystyniak, Teasdale, and Deputy Superintendent Nancy Coratti mentioned to him in a November 2006 meeting that they also wanted to remove Vereecke from his role as athletic coordinator at Milford, but neither Krystyniak nor Teasdale was questioned about such a meeting in their depositions.

*2. The Basketball Game Incident and Removal from Position as Athletic Coordinator*

During a varsity basketball game at Milford on February 9, 2007, a fight broke out among the student spectators after a halftime sportsmanship activity soured. According to Greg Michaels, Athletic Director at Lakeland High School ("LHS"), whose team was Milford's opponent, a former police officer attempted to stop the fight. LHS parents reacted aggressively to the officer's actions and Michaels intervened to head off the parents. After order was reestablished, Vereecke approached Michaels in a "rude, hostile and unprofessional manner" to complain about the LHS students. Michaels reported that Vereecke then acted inappropriately for the rest of the game, including yelling profane language at LHS students. In contrast, Maloney, who was also at the game, asserts that "Gregory Michaels and Charles Vereecke were equal participants in the verbal confrontation and both raised their voice to the other."

After the incident, Teasdale conducted an investigation into what happened. Teasdale reported that he received in-person accounts that Michaels was "in control" and not animated "to the same degree that Vereecke was." Teasdale interviewed Michaels, who reported that he felt Vereecke had been "overreacting." Teasdale also met with Vereecke, who admitted to him that: (1) he knew a group of students from each school would meet and shake hands at halftime to demonstrate good sportsmanship; (2) he should have but did not inform the athletic director or principal about the plan; (3) he confronted Michaels demanding to know what action was going to be taken; and (4) that

he "blew [his] temper." On March 19, 2007, Teasdale issued Vereecke a written reprimand for his conduct at the game. Teasdale did not issue a written reprimand to Michaels, although he had the power to do so. Vereecke concedes that neither his tenure as a teacher, his compensation, nor his benefits were affected by this reprimand.

Sometime after Teasdale sent Vereecke the reprimand, however, he recommended to Superintendent Johnston that she not renew Vereecke's position as the athletic coordinator at Milford. He based his recommendation on the February 9 basketball incident and the "issues in the beginning of the year" with Debbie Schultz. At some point that spring, Johnston followed Teasdale's recommendation and decided that Vereecke's athletic coordinator contract would not be renewed for the 2007–2008 school year. Johnston testified at her deposition that she concluded Vereecke was no longer a suitable ambassador for the school because of these incidents. Teasdale notified Vereecke of the district's decision on June 13, 2007. In their deposition testimony, both Teasdale and Johnston denied that Vereecke's lawsuit against the district played any role in this decision. Although this decision had no effect on his tenure status, Vereecke contends that the loss of extra-duty pay amounting to $8,000 per year could affect his pension benefits, which are calculated using the salary of the individual's three highest-earning years of the last five of his employment.

*3. The Pepsi Refrigerator Incident and Larceny Charges*

On June 14, 2007, the day after receiving the notice, Vereecke cleaned out his belongings from the athletic coordinator office, including a Pepsi mini-refrigerator. Vereecke concedes that he took the refrigerator without permission, but claims that he did so because he believed it had been given to him by a Pepsi representative a few years earlier. The refrigerator was one of six loaned to Milford for school-related use, but the Pepsi representative had not given anyone permission to take the refrigerators off the premises. Several Milford employees saw Vereecke remove the Pepsi refrigerator from the school and reported the removal to Krystyniak.

The next day, Krystyniak asked police deputy Steve Dooley, the school liaison deputy from the Oakland County Sheriff's Department, to investigate. With Detective

Chris Miller from the Sheriff's Office, Dooley went to Vereecke's house to investigate and saw the refrigerator sitting in plain view in Vereecke's garage. After speaking with Vereecke, who admitted he took the refrigerator but asserted his belief that it belonged to him, the officers confiscated the refrigerator and brought it back to Milford. The officers also issued Vereecke a ticket for larceny. The case was referred to the Oakland County prosecutor's office, which, on August 8, 2007, elected not to prosecute due to questions of Vereecke's intent at the time of the incident.

Teasdale testified at his deposition that any time it is reported that a school employee has removed school property from the premises, the school district proceeds with the investigation by involving the police, and allowing them to investigate, prepare a report, and take the matter to the prosecutor who decides whether to proceed further. The teachers' union president, Mike MacGregor, qualified this assertion, explaining that he had never experienced any situation where a school reported an incident to the police without first notifying a union representative. Teasdale did contact MacGregor sometime in the evening on June 15, after the investigation had already been completed and the ticket issued. The investigation did not cause Vereecke to lose his job or tenure.

D.

On August 31, 2007, shortly after Kelly Vereecke's underlying suit settled, Charles Vereecke filed the present action in federal court. Vereecke brought the action under 42 U.S.C. § 1983, alleging that the actions taken against him discussed above were in retaliation for the underlying lawsuit that he filed on behalf of his daughter. He alleged that because the underlying lawsuit was speech protected under the First Amendment, the adverse employment actions taken by the defendants violated his First Amendment rights. Vereecke claimed compensatory damages for loss of income, loss of reputation, mortification, embarrassment, humiliation, degradation, and anxiety and mental anguish, and he also sought punitive damages. The defendants collectively moved for summary judgment on all claims. The district court granted the motion on July 14, 2008. Vereecke timely appealed.

II.

We review *de novo* a district court's grant of summary judgment.  *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc).  Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court must review all the evidence, facts, and inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In order to defeat a summary judgment motion, the nonmoving party "must show sufficient evidence to create a genuine issue of material fact."  *Prebilich-Holland v. Gaylord Entm't Co.*, 297 F.3d 438, 442 (6th Cir. 2002).  The nonmoving party must present evidence sufficient to permit a reasonable jury to find in its favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

III.

A.

In order to establish a *prima facie* claim of First Amendment retaliation, Vereecke must demonstrate that:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).  We assume without deciding that Vereecke's lawsuit on behalf of his daughter qualifies as protected speech.  *See id.* (outlining our two-part test, which requires findings that the speech was

of public concern and that the employee's free-speech interests outweighed the efficiency interests of the employer).  Further, with respect to the second element, we assume without deciding that the reprimands, Vereecke's removal from the position of athletic coordinator, and the police investigation instigated by Krystyniak were adverse, if not independently then at least in the aggregate.  *Cf. Lahar v. Oakland County*, 304 F. App'x 354, 357, 358–59 (6th Cir. 2008) (per curiam) (aggregating of all the employer's actions and analyzing whether they "r[o]se to the level of adverse-employment action").  We now turn to the third element of a retaliation claim.

The third element of a First Amendment retaliation claim requires the plaintiff to prove "a causal connection between the protected conduct and the adverse action." *Thaddeus-X*, 175 F.3d at 399.  When assessing motive in the context of a summary judgment motion, "[B]are allegations of malice [do] not suffice to establish a constitutional claim."  *Crawford-El v. Britton*, 523 U.S. 574, 588 (1988).  This court has held that "[c]ircumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate."  *Thaddeus-X*, 175 F.3d at 399.

Vereecke must demonstrate "that the speech at issue represented *a substantial or motivating* factor in the adverse employment action.  Specifically, [he] must point to specific, nonconclusory allegations reasonably linking [his] speech to employer discipline."  *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003) (internal quotation marks and citations omitted) (emphasis added).  We have interpreted this inquiry to mean that "a 'motivating factor' is essentially but-for cause—'without which the action being challenged simply would not have been taken.'"  *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007) (quoting *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)).  This Court utilizes a burden-shifting analysis for this part of the claim: "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant.  If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment."  *Id.* (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285–86 (1977)).

Vereecke argues that the temporal proximity between Kelly's lawsuit and the disciplinary actions and other evidence that he categorizes as direct evidence, taken together, permit the inference that speech was a motivating factor in the defendants' actions.

Substantial case law from this circuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone. *See, e.g.*, *Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."); *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006) ("Although temporal proximity itself is insufficient to find a causal connection, a temporal connection coupled with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."); *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) ("The mere fact that Cooper was discharged four months after filing a discrimination claim is insufficient to support an interference [*sic*] of retaliation."). In applying employment discrimination statutes, however, we have accepted temporal proximity as a valid basis from which to draw an inference of retaliatory motivation under limited circumstances. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524–25 (6th Cir. 2008). Specifically, the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with "other evidence of retaliatory conduct to establish causality." *Id.*

In *Mickey*, the case for inferring causation from temporal proximity was very strong, because Mickey's employer fired him the very day he learned of Mickey's charge with the Equal Employment Opportunity Commission ("EEOC"). *Id.* We wrote that Mickey's case exemplified the original justification behind using temporal proximity to infer causal motivation: "[I]f an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and *little other than the protected activity could*

*motivate the retaliation.*" *Id.* (emphasis added). And we noted that evidence in addition to that of temporal proximity buttressed Mickey's argument in opposition to summary judgment. *Id.* at 526.

In analyzing the facts in temporal proximity cases, we have always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn. At this point, our case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference. *See Randolph*, 453 F.3d at 737 (finding a four-month gap between protected action and termination to be insufficient on its own, but finding causation where temporal proximity was accompanied by indicia of retaliatory conduct); *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999) ("The causal connection between the adverse employment action and the protected activity . . . may be established by demonstrating that the adverse action was taken shortly after plaintiff filed the complaint and by showing that he was treated differently from other employees."). Indeed, we have rarely found a retaliatory motive based only on temporal proximity. Even in *Mickey*, where we articulated the principle that temporal proximity could hypothetically be sufficient in a given case, we noted the presence of additional evidence.

Unlike Mickey, who presented rather strong evidence of temporal proximity, Vereecke has shown little more than coincidence, which is insufficient on its own to show causation. First, the decision to remove him as athletic coordinator was made nearly eight months after the underlying lawsuit was served on the defendants. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 566–67 (6th Cir. 2000) ("[P]revious cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months." (quoting *Parnell v. West*, No. 95-2131, 1997 WL 271751, at *3 (6th Cir. 1997))). Second, Vereecke's bad behavior served as strong motivation for the November 2006 and March 2007 letters of reprimand. The absence of close temporal proximity and the presence of an obviously

nonretaliatory basis for the defendants' decision amount to insufficient evidence to permit an inference of retaliatory motive.

In addition to *Mickey*, Vereecke cites several other cases discussing temporal proximity in an attempt to support his claim—namely, *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004), *Muhammad v. Close*, 379 F.3d 413 (6th Cir. 2004), and *Hamilton v. General Electric Co.*, 556 F.3d 428 (6th Cir. 2009). These cases provide little assistance to Vereecke, however. Throughout our case law on temporal proximity, we emphasize the importance of the particular facts surrounding an employer's action, and none of the cases on which Vereecke relies bears substantial similarity to the facts here. The plaintiff in *Hamilton* showed increased scrutiny of his work before he was fired as well as temporal proximity. *Hamilton*, 556 F.3d at 436. In *Muhammad*, we merely remanded for the district court to consider whether evidence of temporal proximity and other evidence were sufficient to defeat summary judgment. 379 F.3d at 417–18. And in *DiCarlo*, we found that temporal proximity was sufficient to create a *prima facie* case on the facts presented but did not resolve the ultimate issue of whether DiCarlo could survive summary judgment. 358 F.3d at 422; *see also Tuttle*, 474 F.3d at 321 (finding a causal connection where the plaintiff presented evidence of verbal threats in addition to temporal proximity); *Nguyen*, 229 F.3d at 567 ("[I]n Nguyen's case, the fact of temporal proximity was not particularly compelling, because the plaintiff's retaliation case was otherwise weak, and there was substantial evidence supporting the defendant's version of the events.").

Vereecke does not seek to base his entire argument of causation on temporal proximity, however. He also alleges several instances of purported direct evidence of retaliatory intent. Vereecke first relies on Maloney's affidavit, which includes Maloney's assertions that Michaels and Vereecke were equal participants in their verbal confrontation and that in November 2006 Krystyniak and Teasdale expressed to him a desire to remove Vereecke as the athletic coordinator. Although these statements do offer a view of the confrontation that differs from that of Michaels and contribute a bit of information about the timing of the decision-making process, ultimately the affidavit

is of little assistance. Contrary to Vereecke's assertion, the affidavit does not support an inference of retaliatory motive arising from differential treatment of Vereecke and Michaels.

First, there is no evidence that Teasdale and Johnston were aware that Maloney viewed Michaels and Vereecke as equal participants when they made the decision not to renew Vereecke's contract as the athletic coordinator. Their information, based in part on Vereecke's own admissions about losing his temper, supported the view that Vereecke was the more culpable participant.

Second, Vereecke's conduct was not the same as Michaels's conduct. Assuming that the two in fact participated equally in the verbal confrontation, Vereecke's role as the athletic coordinator made him, in his own words, the "host[] of the party," whose responsibilities included doing "crowd control." Moreover, Vereecke had advance knowledge of the planned sportsmanship display that was to take place at halftime and failed to either notify the administration or ensure a safe and supportive environment for the students. Vereecke's claim that his disparate treatment permits an inference of retaliatory motive fails because his conduct was *not the same* as Michaels's.

Finally, apart from the basketball game incident, Vereecke's other inappropriate conduct—the letter to Schultz and overt support of Palmer—occurred prior to the filing of the lawsuit. None of this conduct is disputed. Moreover, Krystyniak expressed displeasure with Vereecke's conduct prior to the filing of the lawsuit. Thus, by November 2006, Krystyniak and Teasdale had ample legitimate reason to consider whether Vereecke should remain as athletic coordinator. Their doing so under the facts of this case does not permit an inference of retaliatory motive. Maloney's affidavit thus adds nothing that could give rise to an inference of retaliatory motive.[1]

---

[1]To the extent that Maloney seeks to give an opinion about whether Vereecke's removal as athletic coordinator was justified and the motivation for his removal, the affidavit does not constitute admissible evidence. It is not based on personal knowledge and constitutes inadmissible lay opinion testimony. *See* Fed. R. Evid. 701 ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inference is limited to those opinions or inference which are . . . rationally based on the perception of the witness . . . ."); *Collins v. Yellow Freight Sys., Inc.*, 93 F. App'x 854, 862 (6th Cir. 2004) (ruling that a co-worker's testimony as to why the plaintiff had been denied access to a disability work program lacked foundation and was speculative because the co-worker was not involved in the

Vereecke also relies on the fact that the administration failed to contact a union representative before making the June 15 decision to pursue an investigation of the stolen Pepsi refrigerator. In support of this contention, Vereecke offers Union President MacGregor's deposition testimony that he had never before experienced a situation where a school reported an incident to the police without first notifying a union representative. This testimony seems of little import. It is undisputed that district policy was to turn the matter over to the school liaison to the sheriff's office and let the police handle the matter. It is also undisputed that Teasdale contacted MacGregor the same night that he turned the investigation over to the police. The timing of the call to MacGregor hardly permits an inference of retaliatory motive.

Finally, Vereecke's contends that the November 17 letter also placed tighter scrutiny on his teaching, as it placed his "professional conduct . . . under review." *See Hamilton*, 556 F.3d at 436 (finding increased scrutiny of one's work to be evidence of improper retaliation). But unlike in *Hamilton*, Vereecke has shown no evidence of his teaching receiving closer scrutiny, nor has he since received even a lowered evaluation of his professional abilities. *Compare Moore*, 171 F.3d at 1080 (considering evidence of frequent discipline for trivial matters and unwarranted criticism of the plaintiff's work to support the jury's finding of retaliation).

Vereecke's evidence of temporal proximity and other evidence, taken together, do not permit the inference that the adverse employment actions taken against him were motivated, at least in part, by a desire to retaliate for his exercise of his First Amendment rights. Further, Vereecke concedes all the critical facts that show the Defendants had valid, non-retaliatory justifications for the discipline that they imposed on him. Because Vereecke has not presented evidence sufficient to raise a genuine issue of material fact in support of the third element of his claim—causation—we affirm the district court's grant of summary judgment on the § 1983 claim against Krystyniak and Teasdale.

---

decision to deny the plaintiff access).

B.

To defeat summary judgment on his remaining § 1983 claim of municipal liability, Vereecke must present evidence that the Huron Valley School District is responsible for retaliating against him because of his exercise of his First Amendment free speech rights. Vereecke cannot base his claims against the Huron Valley School District solely on the individual defendants' conduct because "*respondeat superior* is not available as a theory of recovery under section 1983." *Doe v. Claiborne County*, 103 F.3d 495, 507 (6th Cir. 1996) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978)). "Rather, [he] must show that the School District *itself* is the wrongdoer." *Id.* To hold the municipal defendant liable, Vereecke must: "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [his] particular injury was incurred due to the execution of that policy." *Turner v. City of Taylor*, 412 F.3d 629, 639 (6th Cir. 2005) (internal quotation marks and citation omitted). A "custom" must "be so permanent and well settled as to constitute a custom or usage with the force of law." *Monell*, 436 U.S. at 691.

Vereecke attempts to satisfy this burden by arguing that the decisionmakers—Johnston, Teasdale, and Krystyniak—were also the District's policymakers in this matter. This does not help Vereecke. Because the individual defendants did not violate his constitutional rights under the First Amendment, Vereecke cannot rely on their conduct to establish a claim of municipal liability. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("If a person has suffered no constitutional injury at the hands of the [municipality's] officer, the fact that the [policy, practice, or custom] might have authorized the use of constitutionally excessive force is quite beside the point."). Accordingly, we affirm the district court's grant of summary judgment to the Huron Valley School District.

IV.

For the foregoing reasons, we affirm the district court's grant of summary judgment.