**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0214n.06

Case No. 13-3957

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Mar 19, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| HENRI EISENBAUM, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE SOUTHERN DISTRICT OF |
| SENIOR LIFESTYLE CORPORATION, et | ) | OHIO |
| al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: DAUGHTREY, SUTTON and DONALD, Circuit Judges.

SUTTON, Circuit Judge. Henri Eisenbaum and Michelle Chasteen had a turbulent relationship when they worked together at the Seasons Retirement Community, one that eventually prompted this lawsuit. Eisenbaum alleges that Chasteen sexually harassed him and that Seasons and its owner, Senior Lifestyle Corporation, retaliated against him when he complained about her conduct. The district court disagreed as a matter of law, and granted the defendants' motion for summary judgment. We affirm.

I.

When the seasons change, the employee uniforms at the Seasons Retirement Community change as well. In the spring of 2007, Henri Eisenbaum, the maintenance director at Seasons, switched to a new uniform of a polo shirt and khaki shorts. Michelle Chasteen, the marketing

director, noticed. She soon told Eisenbaum that he had nice legs and a "nice butt." R.38 at 39. Similar comments continued. Eisenbaum found them offensive and, after about six of them, asked her to stop. She did.

At that point, as Eisenbaum sees it, his once-civil relationship with Chasteen took a turn for the worse. She began to give him the cold shoulder, and their strained working relationship made it more difficult for him to do his job. Eisenbaum twice complained about her behavior to John Quattrone, his supervisor and the executive director at Seasons—once before Quattrone took time off due to an ankle injury and once after he returned. Quattrone tried to mediate the dispute between Eisenbaum and Chasteen, but his efforts went nowhere.

On July 6, 2007, Eisenbaum received a "performance improvement plan" from Quattrone. R.38 at 129. The plan listed three areas of unsatisfactory performance and four areas of needed improvement. Quattrone planned to monitor Eisenbaum for thirty days to see if he improved. Eisenbaum apparently performed well for the next thirty days, as neither he nor Quattrone mention any other consequences stemming from the plan.

Eisenbaum's troubles lay dormant for the next year or so. The spring of 2009 ushered in a series of personnel changes at Seasons. Chasteen left in February of 2009. Eisenbaum's working relationship with the marketing department "got a bit better" after her departure. Quattrone left about a month later. Linda Keith replaced Quattrone as the interim executive director. Through all of this, Eisenbaum received two annual pay raises.

Keith issued a series of disciplinary write-ups for Eisenbaum in the spring of 2009. On March 15, 2009, she told Eisenbaum to complete maintenance issues before the end of the day. The written notice stated that a resident wandered out of Seasons because Eisenbaum did not immediately repair a malfunctioning door alarm. On April 22, 2009, a resident reported going

almost a day without a working toilet. Then John Suchomski, part of Senior Lifestyle Corporation's maintenance management team, visited Seasons. He prepared a "Senior Lifestyle Maintenance and Facilities Site Visit Report." R.38 at 56–58. Keith discussed the report with Eisenbaum and asked him to address the maintenance-related issues in the report. On May 15, 2009, Eisenbaum received a third written notice, chastising him for failing to address the issues in Suchomski's report. Later that summer Thomas Rotz replaced Keith as the executive director.

On August 8, 2009, Eisenbaum hurt his back while moving a television. He woke up with a stiff neck, but he did not file a workers' compensation claim immediately because he wanted to try to continue doing his job. On September 1, 2009, Eisenbaum realized he could not keep working and went on leave for his injury.

Seasons sent him a letter stating that his leave period ended on November 24, 2009. The letter added that they would treat his failure to report to work before then as a "voluntary resignation" and stated that he had to confirm his intention "to return to work at the expiration" of his leave "[a]t least one week" before his leave expired and submit a "Return-to-Work notice prior to [his] Return-to-Work" date. R.33-6 at 14–15. Eisenbaum did not return to work. On November 25, 2009, Eisenbaum received a letter stating that Seasons considered him "to have resigned [his] job effective" that date because he had not yet been released for full time work and his twelve-week leave period had expired. R.38-14 at 1.

Eisenbaum's doctors cleared him to work about a month later. On November 30, 2009, Eisenbaum's doctor cleared him for light work with restrictions starting on December 14, 2009. R.38-15 at 1. Eisenbaum saw a posting for his old job and sent in an application by e-mail on December 18, 2009, but he never heard back from the company. On January 18, 2010, his doctor fully cleared him for work.

3

Eisenbaum filed this lawsuit against Seasons and the Senior Lifestyle Corporation after receiving a notice of dismissal and a right-to-sue letter from the Equal Employment Opportunity Commission. He claimed he had been subjected to (1) sexual harassment that created a hostile work environment under federal law and (2) retaliatory termination for complaining about that harassment under federal and state law. The district court granted summary judgment in the defendants' favor.

## II.

As always, we give the district court's summary judgment decision a fresh look. *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 877 (6th Cir. 2013). And as always, we apply Civil Rule 56 in doing so, drawing all reasonable inferences in Eisenbaum's favor and affirming the judgment only if no genuine issues of material fact cloud the dispute and only if the defendants deserve judgment as a matter of law. *Id.*

*Hostile Work Environment*. Title VII of the Civil Rights Act of 1964 prohibits, among other things, "the creation of a hostile work environment" on the basis of an employee's gender. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2441 (2013). To establish a violation of that prohibition, Eisenbaum "must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered." *Id.* He has not.

Chasteen's comments about Eisenbaum's lower half were not "sufficiently severe or pervasive to alter the conditions of [his] employment." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146–47 (2004). He remembers six comments, which ended as soon as he asked Chasteen to stop making them. Even he describes them as "silly comments and anatomical references," App. Br. at 25, placing them in the category of "mere offensive utterance[s]" rather than "physically threatening or humiliating" conduct. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17,

4

23 (1993). And he never suggests that the comments interfered with his ability to do his job. *See id.* Whether looked at singly or cumulatively, none of these circumstances shows that Chasteen's comments created a hostile work environment for Eisenbaum.

Perhaps for that reason, Eisenbaum focuses not on Chasteen's comments but on her frosty behavior after he asked her to stop making them. She went from a cooperative coworker, he claims, to an obstacle he had to overcome, avoiding him and telling others she found him hard to work with. R.38 at 45. Even assuming all of this rises to the level of harassment (which is doubtful), nothing in the record suggests that she behaved this way because of Eisenbaum's gender. "Rather, [her behavior] seems to have been motivated entirely by [her] personal displeasure toward plaintiff and the complaints [he] made to [Quattrone]." *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 791 (6th Cir. 2000). Such behavior "is not actionable as *sexual* harassment under Title VII." *Id.*

Eisenbaum also hints that Chasteen and the company engaged in *retaliatory* harassment rather than *sexual* harassment. But his complaint does not contain such a claim. Nor does his response to the defendants' motion for summary judgment. Having opted not to pursue this claim below, he cannot expect us to pick up after him on appeal. *See Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 519–20 (6th Cir. 2013).

*Retaliation*. Title VII also prohibits an employer from retaliating against an employee because he opposed unlawful discrimination. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013). Eisenbaum thinks that Senior Lifestyle Corporation and Seasons did just that when it let him go after his leave expired and then decided not to hire him back when he reapplied. To succeed, he must show that the defendants took those actions *because* of his

5

opposition—"that the desire to retaliate was the but-for cause of [their actions]." *Id.* at 2528. He has not.

Eisenbaum points to the timeline of events as evidence of causation. Taken together with other considerations, temporal proximity may indeed indicate causation. But the relevance of that factor dims as time passes between the alleged act of opposition and the alleged act of retaliation. In this instance, timing does not advance Eisenbaum's cause. He first complained about sexual harassment in the spring of 2007, when he told Quattrone about Chasteen's comments. Two and a half years passed before his leave expired and the defendants let him go on November 25, 2009. "Action taken (as here) [over] 20 months later suggests, by itself, no causality at all." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) (per curiam).

Perhaps, giving Eisenbaum the benefit of the doubt, Quattrone never told anyone about Eisenbaum's complaints before he stepped down as executive director. If not, the defendants would have first learned about Eisenbaum's complaints on May 13, 2009, when his counsel sent a letter to Senior Lifestyle Corporation's Senior Vice President of Human Resources, Bill Blouin. The letter stated that Eisenbaum believed Seasons and Senior Lifestyle Corporation had violated Title VII and threatened to sue if they let him go. Even then, almost six and a half months passed between the date of the letter and November 25, 2009, when his leave expired and the defendants let him go. That stretch of time shows "little more than coincidence." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (eight months).

Eisenbaum's other evidence of an alleged connection between his complaints and his termination comes up short as well. Eisenbaum points to the three disciplinary write-ups he received in 2009, each issued by interim executive director Keith. But nothing in the record

suggests that Keith knew about his complaints or for that matter issued the write-ups as punishment.

Apparently appreciating the point, Eisenbaum tacks back to a distinct theory of causation—that Chasteen griped about him to Senior Lifestyle Corporation managers to get back at him for complaining about her to Quattrone. The volume and venomous nature of her complaints, he says, negatively colored their impression of him, thereby infecting all their actions with her retaliatory motives. This theory does not work either. The record shows that Chasteen complained to only a few people at Senior Lifestyle Corporation. The first was Mark Francis, a member of the marketing management team. During one of his visits to Seasons, he and Chasteen called Eisenbaum from Chasteen's office to discuss refurbishing an apartment. Chasteen called Eisenbaum's responses "uncooperative" and said, "I can't work with this guy." R.38 at 128–29; *see also* R.40 at 64, 75–78. The second was Bill Blouin, the human resources director. He asked Chasteen why she decided to leave during an exit interview, and she told him "about the issues . . . with apartment readiness and the maintenance department." R.40 at 75. Chasteen and the rest of the Seasons marketing staff "were vocal with corporate . . . that they were having issues with the maintenance department," though the record does not reveal the contents or recipients of those complaints. R.40 at 79. Nothing in the record suggests that Francis or Blouin relayed Chasteen's complaints to Keith.

Eisenbaum also concedes that each of the write-ups stemmed from a real incident—a broken door alarm, a clogged toilet, or other maintenance issues. He argues only that Keith should have accepted his explanation and not issued a write-up. That makes the write-ups at most unreasonable, but it does not show they were retaliatory.

*Wrongful Discharge in Violation of Ohio Public Policy*. Ohio law prohibits another type of retaliation: firing an employee because he hired a lawyer. *See Chapman v. Adia Servs., Inc.*, 688 N.E.2d 604, 610 (Ohio Ct. App. 1997). Eisenbaum's claim that Senior Lifestyle Corporation and Seasons violated that prohibition falls short for the same reason as his federal retaliation claim. He cannot prove that they let him go when his medical leave expired *because* he hired a lawyer. *See Collins v. Rizkana*, 652 N.E.2d 653, 657–58 (Ohio 1995). All he has is timing—the six months between May 13, 2009, when the defendants learned he hired a lawyer, and November 25, 2009, when they let him go—and Ohio requires something more. *See Sells v. Holiday Mgt. Ltd.*, 2011 WL 5825407, at *10 (Ohio Ct. App. 2013) (collecting cases explaining that "temporal proximity alone is insufficient to support a finding of a causal connection").

## III.

For these reasons, we affirm.