**Noe PENA, Plaintiff–Appellant,**

v.

**CITY OF FLUSHING, Defendant–
Appellee.**

No. 15–2316

United States Court of Appeals,
Sixth Circuit.

FILED June 07, 2016

Alec Scott Gibbs, Gregory Thomas Gibbs, Law Office of Gregory T. Gibbs, Flint, MI, for Plaintiff–Appellant.

Mary Massaron, Bloomfield Hills, MI, Audrey J. Forbush, Flint, MI, Plunkett Cooney, for Defendant–Appellee.

BEFORE: COLE, Chief Judge; McKEAGUE and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

The City of Flushing fired Noe Pena when he refused to attend a medical examination as a condition for returning to work after a medical leave. Pena alleges the City regarded him as disabled in violation of the Americans with Disabilities Act, and retaliated against him for complaining about discriminatory treatment in violation of Title VII. The district court granted summary judgment in favor of the City, and we affirm.

## I.

Plaintiff Noe Pena began working for the City as a wastewater treatment plant operator in 2004. In 2007 and 2008, a co-worker made comments to Pena about his national origin (Mexican). Pena complained about these remarks to his supervisor, Doug Parkinson, and to the City's manager, Dennis Bow.

Pena's performance also declined around this time. In January 2008, Parkinson reprimanded Pena for failing to complete certain tasks. Pena then sought out psychological treatment because workplace "stress"—caused by the harassing conduct—led to distractions and "interfered with [his] duties." Bow placed Pena on a paid leave of absence, and sought certification from Pena's treating therapist that Pena was "capable of performing his duties" to ensure safety for all after "Mr. Pena ha[d] indicated that he was seeing a therapist, that he was taking medicines, and that he has a problem staying focused because of alleged harassing comments from a fellow worker."

The City conducted workplace training to mitigate Pena's complaint, and Pena returned to work in the spring of 2008. His co-workers were not happy he complained about mistreatment, but Bow subsequently facilitated a meeting between Pena and his co-workers and they "all agreed things were going much better between them now." Aside from a medical leave of absence due to respiratory issues arising from workplace conditions in 2012, Pena's employment with the City was unremarkable until summer 2013.

That July, Pena was again "distracted" and "stressed" at work. His work stressors manifested as complaints about his job duties, including: issues related to having to wear a mask as a result of his 2012 leave; not being permitted to snowplow anymore; not being placed favorably on the overtime list; and not being immediately given a key after a lock was changed at the Department of Public Works. These "distractions," in Pena's view, were "based on discrimination and retaliation."

Pena again sought psychological treatment, which led to him being placed on medical leave beginning August 21, 2013. He supported his leave request with the following nondescript doctor's note:

"Above pt was seen today. He needs to be on sick leave from 8/21/13 to 9/29/13. Return to work 9/30/13." Pena met with Bow and explained his need for the leave, as well as "gave [Bow] examples of how [he] was being treated; how [he] was not being treated fairly and equally like all the other [union] members." Bow "tried to get [Pena] to agree to a transfer," but Pena declined and just wanted Bow to "fix the problem."

Pena's discussion with Bow immediately concerned Bow "because of [Pena's] lack of ability to communicate and really tell [Bow] what was bothering him." As Bow testified:

As he was talking to me, I think he realized he was drifting off and talking gibberish, not finishing sentences. I couldn't get any clarification of why he was going off on a sick leave. I didn't have any sense of it.

And that's when he laughed and he said, I'm sorry, I didn't have my medications today. So he was having difficulty expressing to me the reasons that he was going off onto this sick leave.

Bow had hired Pena and knew him throughout his entire time as a City employee, and "saw a different person that day":

So my concern, my anxiety went up a little bit, that something was wrong. And if there was an issue that he was dealing with, I wanted to make sure it got dealt with properly. From his doctor's notes, I could tell very little what was going on with him.

On September 26, 2013, Pena's doctor extended his sick leave to October 27, 2013. When Pena's return to work date approached (and as his own doctors cleared him to work), Pena texted Parkinson that he would be returning. The next day, he received a letter from Bow dated October 24, 2013, which provided in pertinent part as follows:

Due to the nature of your extensive leave from work, the city will require a medical clearance before your return to work.

Upon clearance from your doctor, you are hereby directed to contact Dr. Linda Forsberg at PSYBUS PC ... for an evaluation.... The city reserves the right to require a physical examination upon the conclusion and possible clearance for return to work from Dr. Forsberg.

This fitness for duty examination request was borne, in part, out of the union contract governing the terms and conditions of Pena's employment: "employees who are on sick or disability leave for more than one week, must get a return to work slip from the Doctor designated by the Employer at Employer's expense."

Bow wrote separately to Dr. Forsberg, explaining why he referred Pena to her office for an examination:

Mr. Pena has been sent to your office for concerns involving his mental and physical health while being employed with the City of Flushing.

During the last two years, he has taken over four months off from work, mostly in the summer. Initially, Noe complained of pulmonary symptoms that were affecting his breathing. A cold turned into the "Flu" in June of 2012, and he was out of work for the next two and one-half months. The city did not challenge his condition with any follow up, but did welcome him back to work in the fall. This year, Mr. Pena has taken off of duty due to a psychological reason that is unknown to the city. We are now asking for a psychological evaluation before returning him to another position. Mr. Pena has worked for the city in the area of the wastewater plant for over

eight years. Due to a problem that he has reported to have with the air quality at the plant, I intend to assign him to a duty within the Department of Public Works, but outside the wastewater plant. I am concerned that he may have issues with the transfer but we do not wish Mr. Pena to experience additional physical problems with the plant. He is not yet aware of the pending transfer.

\* \* \*

Mr. Pena and I had a discussion in August of 2013, where he identified a number of small issues that were bothering him. He seemed overly sensitive to these issues that were unrelated to the breathing problems that he experienced. Due to those discussions, I am concerned that his psychological conditions may be more extensive than we thought.

On October 31, 2013, Pena went to see Dr. Forsberg. But Dr. Forsberg did not examine Pena. While completing pre-examination paperwork, Pena declined to provide informed consent, opting instead to reschedule the examination for a later date and to utilize the time "to consult with [his] attorney or other advisor." Pena exercised this option because he was suspicious of the close timing from when he texted Parkinson that he was going to be returning to when he received Bow's letter, and because Dr. Forsberg's online reviews "were not good at all. One of them said, 'Do not trust this lady.' And the other one had said something about, 'They lost my records.' "

The City reiterated its demand that Pena see Dr. Forsberg on December 9, 2013. Pena made an appointment for January 13, 2014, but later canceled it in order to meet with his attorney. He never rescheduled. Instead, Pena directed his own treaters to provide information about his care. On January 17, 2014, for example,

the Oakland Psychological Clinic provided as follows:

Please be advised that Mr. Pena has received therapy through Oakland Psychological Clinic at various times over the past few years. The most recent date of treatment began on August 5, 2013. The Assessment Update was completed at that time and a diagnosis of Major Depression was made. Mr. Pena was also referred for a Psychiatric Evaluation with Nikhil Vora, M.D. Mr. Pena reports compliance with the medications prescribed and symptom reduction is noted.

Efforts in therapy have been focused on stress management training, the development of effective problem solving strategies, and cognitive restructuring. Mr. Pena has been engaged and cooperative throughout the therapy process and following a review of his position summary, he appears capable of performing the duties required of him at the wastewater treatment plant without accommodation.

He also requested that the City reconsider its no return without examination by Dr. Forsberg decision, to no avail.

Bow terminated Pena's employment on March 14, 2014. The termination letter noted the City's request that Pena be evaluated by Dr. Forsberg prior to returning to work, and then concluded:

Your refusal to follow a direct order from your supervisors is considered insubordination. In accordance with Section five of article VI of the AFSCME contract, insubordination is a cause for dismissal.

As you have not returned to work with the proper clearance for fitness of duty that is acceptable to the city, and since the insubordinate actions continue to impair employment expectations, your em-

ployment with the City of Flushing is hereby terminated.

Pena commenced this litigation in September 2014. He alleged the City violated the ADA by: (1) requiring a medical examination that was not job-related and consistent with business necessity; (2) not allowing him to return to work and ultimately terminating him because it regarded him as disabled; and (3) retaliating against him for exercising his ADA rights. He also claimed the City violated Title VII by: (1) not allowing him to return to work and ultimately terminating him due to his race and national origin; and (2) retaliating against him for exercising his Title VII rights. The district court entered summary judgment in favor of the City. On appeal, Pena contends the district court erred in dismissing his ADA discrimination claims and his Title VII retaliation claims.[1]

## II.

We review the district court's grant of summary judgment de novo. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). Summary judgment is proper when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Although we view the evidence in a light most favorable to the nonmovant, *Rogers*, 737 F.3d at 1030, "[t]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III.

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a), (b). "Disability" includes "being regarded as having such an impairment." § 12102(1)(C). Under the *McDonnell Douglas* burden-shifting approach, an employee establishes a prima facie case by showing: (1) defendant regarded him as disabled; (2) he is otherwise qualified for the job, with or without reasonable accommodation; and (3) he suffered an adverse action because of his disability. *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014). Relying upon our decisions in *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876 (6th Cir. 1996), and *Sullivan v. River Valley School District*, 197 F.3d 804 (6th Cir. 1999), the district court concluded that directing Pena to be seen by a doctor before returning to work did not constitute regarding him as disabled.

In *Kocsis*, we rejected the notion that mere knowledge of an employee's health problems, supplemented with the employee's belief that she had multiple sclerosis, rose to the level of treating the employee differently because the employer regarded her as being disabled:

> From this knowledge, Kocsis argues, the defendant viewed her activities as being substantially limited. In our view, however, there is virtually no evidence to support that position. Kocsis' performance evaluations reveal that the defendant was aware of her health problems, lack of energy, and mood swings. While the defendant may have perceived that Kocsis' health problems were adversely affecting her job performance, there is

---

1. Pena does not appeal the district court's dismissal of his ADA retaliation claim, or his Title VII discrimination claims, thus forfeiting our review of those claims. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006).

no evidence that defendant regarded Kocsis as being unable to care for herself or to perform all of the duties of her job. Therefore, Kocsis cannot establish that she had a disability under the "regarded as" prong of the definition.

97 F.3d at 885.

*Sullivan* is even more on point and is factually indistinguishable. In response to the plaintiff's changed and "odd behavior," the employer placed the plaintiff on leave and required him to undergo mental and physical fitness for duty examinations. 197 F.3d at 808–09. Like Pena, the plaintiff was terminated for insubordination after he refused the examinations, and instead offered "examinations by his own doctors ... attesting to his fitness for continued employment." *Id.* at 809–10 & 809 n. 2. And just like Pena, the plaintiff sought to impose ADA liability based upon the request to undergo medical examinations. *Id.* at 810.

In *Sullivan*, we refused to apply the ADA so rigidly, commenting that an "employer's perception that health problems are adversely affecting an employee's job performance is not tantamount to regarding that employee as disabled." *Id.* This is because "an employer needs to be able to determine the cause of an employee's aberrant behavior." *Id.* Accordingly, "[a] request that an employee obtain a medical exam may signal that an employee's job performance is suffering, but that cannot itself prove perception of a disability because it does not prove that the employer perceives the employee to have an impairment that substantially limits one or more of the employee's major life activities." *Id.* at 811.

Pena attempts to distinguish *Kocsis* and *Sullivan* on the basis that they interpret the ADA pre-amendment. In 2008, Congress amended the ADA in several key aspects, including broadening the "regarded as" prong. As we recently observed:

> Before the 2008 Amendments, the Supreme Court interpreted the ADA to consider a person disabled under the third prong only if a covered entity mistakenly believed that the individual had a physical impairment that was substantially limiting, or mistakenly believed that an actual, nonlimiting impairment was substantially limiting. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), *overturned* by U.S. Pub. L. 110–325 (2009). In passing the 2008 Amendments, Congress liberalized the standard, redefining "regarded as having an impairment" only to require that a defendant took a prohibited action based on a perceived impairment, regardless of whether the employer thought the impairment was substantially limiting.

*Neely v. Benchmark Family Servs.*, No. 15–3550, 640 Fed.Appx. 429, 435, 2016 WL 364774, at *6 (6th Cir. Jan. 26, 2016) (citing 42 U.S.C. § 12102(3)(A)). From this, Pena attempts to draw a bright line to his "regarded as" claim, flowing from Bow's knowledge of Pena's mental condition and treatment and through his request to see Dr. Forsberg. That is, referring an individual to a fitness for duty examination when the employer knows the employee has medical problems is a per se "regarded as" violation.

·To be sure, *Kocsis* and *Sullivan* speak in broad terms about "regarded as" claims also requiring a perception of substantial limitations. *Kocsis*, 97 F.3d at 885; *Sullivan*, 197 F.3d at 811–13. But these cases do not turn on the presence of such analysis. Rather, they recognize the policy choice Congress made by permitting employers to request fitness for duty examinations as long as they are "job-related and consistent with business necessity." 42

U.S.C. § 12112(d)(4)(A); *see, e.g., Sullivan*, 197 F.3d at 811–12. Given that the ADA allows employers to condition employment based upon these examinations even after the 2008 Amendments, we decline to impose per se liability under the "regarded as" provision in this circumstance. Otherwise, we would be reading § 12112(d)(4)(A) out of the ADA. Put differently, "[t]he ADA is a shield against discrimination on the basis of disability; it is not a sword enabling employees who are not, in fact, substantially limited in any major life activity to refuse reasonable requests" by their employers and then use that statutorily-grounded request to plead a "regarded as" claim. *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 705 (4th Cir. 2001).

▮ Having rejected this distinction, *Sullivan* dictates our outcome. In that case, the plaintiff's "aberrant behavior" raised concerns about his work performance, giving the employer "reason to seek further information about his fitness for continued employment." 197 F.3d at 812. Such behavior included engaging in disruptive and abusive verbal outbursts, treating board members with uncouth behavior, and disclosing confidential information. *Id.* at 808–09. As the district court correctly reasoned, Pena's generic "sick leave" note, combined with Pena's "demeanor and response to questions" about his leave, is consistent with *Sullivan* and thus justified the request to seek a fitness for duty examination. *See also Barnum v. Ohio State Univ. Med. Ctr.*, No. 15–3450, 642 Fed.Appx. 525, 532–33, 2016 WL 683251, at *6–7 (6th Cir. Feb. 19, 2016) (rejecting "regarded as" claim when employer referred employee for a fitness for duty evaluation after "there were numerous concerns expressed about [the employee's] inability to concentrate and at least one instance where she could not perform a routine task"); *Johnson v. Univ. Hosp. Physician Servs.*, 617 Fed.Appx. 487, 489, 491 (6th Cir. 2015) (rejecting "regarded as" claim predicated upon referral for fitness for duty evaluation when employee "shared that she had been taking medication that made her sleepy" and was observed sleeping at her desk).

In Pena's view, our holding "offer[s] no protection against inquiries into the disabilities of employees not justified by business necessity, because an excused leave of absence for a serious medical condition, coupled with subjective observations on the part of an untrained supervisor, would necessarily provide sufficient support for an independent medical examination that would reveal actual or perceived disabilities." But in *Sullivan*, we tempered this exact concern, rejecting *Sullivan*'s "worr[y]" that "if an employer can order mental and physical examinations in a case such as his, there is no limit to when an employer can require such tests.... [A]n employer's discretion to order employees to undergo examinations is hardly unbounded"—the ADA expressly limits such requests for examinations to those where the employer can show that it is "job-related and consistent with business necessity." 197 F.3d at 811 (quoting 42 U.S.C. § 12112(d)(4)(A)). "Thus, for an employer's request for an exam to be upheld, there must be significant evidence that could cause a reasonable person to inquire as to whether an employee is still capable of performing his job." *Id.* And we adopted the EEOC's interpretive guidance on fitness for duty examinations providing that "any examination ordered by the employer must be restricted to discovering whether the employee can continue to fulfill the essential functions of the job." *Id.* at 811–12 (citing 29 C.F.R. pt. 1630, App. § 1630.14(c)).

But *Sullivan*'s discussion regarding fitness for duty examinations provided three caveats that are especially fatal to Pena. First, an employee "may not dictate the terms of his medical examination." *Id.* at 809 n. 2. In other words, that Pena's doctors cleared him for duty does not excuse him for failing to see Dr. Forsberg.

Second, we emphasized that employers may "requir[e] mental and physical exams as a precondition to returning to work" and that "[w]e have also upheld a finding of insubordination for refusing to submit to such exams." *Id.* at 812. Accordingly, "an examination ordered for valid reasons can neither count as an adverse job action nor prove discrimination." *Id.* at 813. In Pena's case, this means that the City's request for him to attend a fitness for duty examination is not an adverse action sufficient to satisfy a prima facie case of disability discrimination. *Id.*

And third, we concluded that by failing to submit to examinations, an employee is "precluded ... from being able to establish a genuine issue of material fact as to whether the exams were related to his job, or were too broad in scope." *Id.* at 812. Thus, Pena's protestations regarding the City not providing Dr. Forsberg with his job description, Dr. Forsberg being a psychologist and not a physician, and the City not consulting with an outside health official prior to the referral are without merit.

In sum, the 2008 ADA Amendments did not alter our prior approach to "regarded as" claims under the ADA based upon referrals to fitness for duty examinations. For these reasons, the district court properly granted summary judgment in favor of the City on Pena's ADA claim.

## IV.

Pena's second claim of error is that the district court erred in dismissing his Title VII retaliation claim. In dismissing this claim, the district court assumed Pena established a prima facie case of retaliation and found that he could not establish pretext.

█ The district court should have stopped at the causal connection element of the prima facie case. *See Taylor v. McKee*, 649 F.3d 446, 450 (6th Cir. 2011) ("[T]his court may affirm the decision of the district court if it is correct for any reason, even a reason different from that relied upon by the district court."). It was Pena's burden to draw "a causal connection between the protected activity and the adverse employment action." *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013). Title VII's retaliation provision requires a plaintiff to prove "but-for causation"—"proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas S.W. Med. Ctr. v. Nassar*, —— U.S. ——, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013).

Pena's last protected activity occurred nearly six years before his termination, when he complained in 2008 about being mistreated by his co-workers on the basis of his national origin. This timeframe, "suggests, by itself, no causality at all." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (per curiam). Indeed, "the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to establish causality." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (citation omitted). There is simply no direct or circumstantial evidence suggesting his 2008 complaint was a "but-for" reason for his termination. As the district court noted, the City took steps to remedy the situa-

tion, and Pena never complained about such mistreatment on the basis of his national origin again. Absent a causal connection, Pena's retaliation claim fails.[2]

## V.

For these reasons, we affirm the district court's judgment.

---

**2.** To the extent Pena contends he engaged in protected conduct by complaining to Bow in 2013, the district court aptly addressed why the record did not support such an argument: none of the evidence he relies upon "supports the view that he was discriminated against because of his national origin or race or that he made the City aware that he was suffering such discrimination." Instead, his complaints to Bow all involved workplace gripes—"he was not being allowed overtime or permitted to mow the grass/snow plow, etc."—and made no mention of mistreatment on account of him being of Mexican descent. And even if he did, we agree with the district court's conclusion that Pena did not establish pretext.